IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUTHER SEIGFRIED, JR., | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 02-2951 |
| | : | |
| v. | : | |
| | : | (JUDGE BAYLSON) |
| LEHIGH VALLEY DAIRIES, INC., | : | |
| | : | |
| Defendant | : | |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

Consistent with this Court's Pretrial and Trial Procedures in Civil Cases, Defendant, by and through its counsel, hereby submits the following proposed Statement of Undisputed Facts. Defendant respectfully reserves the right to supplement its Statement of Undisputed Facts upon receipt and review of Plaintiff's Counter-Statement of Disputed/Undisputed Facts.

**I.      THE WITNESSES**

1. Plaintiff, Luther Seigfried ("Plaintiff"), is a current employee of Lehigh Valley Dairies, Inc. ("Lehigh" or "Defendant"). (Seigfried at 8, 27 ).[1]

2. Diane Kett is employed as the Human Resources Manager at Lehigh. She was employed in that capacity during the relevant time period. (Kett at 31-32).

---

[1] Citations to witness deposition testimony in Defendant's Statement of Undisputed Facts appear as "Witness Name at __". Citations to exhibits to witness deposition testimony appear as "Witness Name __". For ease of reference, the deposition transcripts are attached in their entirety as Exhibit A in Defendant's Appendix to its Motion for Summary Judgment on all Plaintiff's Claims.

3.  Jim Heath is employed as the Maintenance Manager at Lehigh. He held that position during the relevant time period. (Heath at 12-13). Plaintiff currently reports directly to Mr. Heath, and did so during the relevant time period. (Seigfried at 62).

4.  Ron Bivinghouse is employed as the Company's Environmental Safety and Security Manager. He held that position during the relevant time period. (Bivinghouse at 33).

5.  James Macri is the Vice President of Operations at the Company. He held that position during the relevant time period. (Macri at 8).

6.  Fran Hendrix, Plaintiff's Union co-worker, is a current employee of the Company. (Hendrix at 8). He has served as a Union Shop Steward since 2001. (Hendrix at 9). He testified under subpoena issued by Plaintiff's counsel. (Hendrix at 49).

7.  John Fogarty is employed by Teamsters Local No. 463 as Organizer and Business Agent. He has been the Business Agent for Lehigh since approximately 1999. (Fogarty at 12, 14).

## II.  PLAINTIFF'S EMPLOYMENT HISTORY

8.  Plaintiff has been continuously employed by Lehigh since 1979. (Seigfried at 8, 27).

9.  While Plaintiff was and continues to be an employee of Lehigh, he was and continues to be a member of a bargaining unit covered by a collective bargaining agreement between Lehigh and the International Brotherhood of Teamsters Union Local No. 463 ("Local 463") with whom Lehigh has had a longstanding collective bargaining relationship. (Seigfried at 14, 35).

10. The terms and conditions of Plaintiff's employment, including discharge and discipline, are governed principally by the terms of the labor contract. (Seigfried at 55, 176-77 and Seigfried 5).

11. In 1979, the Company hired Plaintiff to work in the Cooler Department at Lehigh's Lansdale, Pennsylvania facility. (Seigfried at 12-13).

12. On February 9, 1987, Plaintiff sustained a work-related back injury lifting a case of milk. (Seigfried at 17).

13. Plaintiff went on a workers' compensation leave of absence until September, 1988. (Seigfried at 8, 22).

14. Plaintiff returned to work with limited medical restrictions in September, 1988 work as a "Clerk" in the Maintenance Department, a position <u>that the Company created for him</u>. (Seigfried at 18, 149-50 and Seigfried 7).

15. In the Clerk position, Plaintiff was responsible for performing non-manual work, including preparing work orders, conducting safety inspections, and posting notices throughout the Company. (Seigfried at 19).

16. The job duties and responsibilities associated with the Clerk position were consistent with his medical restrictions. (Seigfried at 18).

17. In approximately 1990, Plaintiff took over the "relief" responsibility at the Company's Water Treatment Plant. (Seigfried at 24).

18. The Company consulted with Plaintiff's health care provider, as well as Plaintiff, prior to adding the relief responsibility to his position. (Seigfried at 75, 78, 151-52 and Seigfried 8).

19. This hybrid job too was created by the Company for Plaintiff. (Seigfried at 78, 85; Heath at 89).

20. By adding the relief responsibility at the Treatment Plant, Plaintiff's seniority was unaffected and he received a pay increase. (Seigfried at 26).

21. Plaintiff was provided a "helper" for any heavy lifting at the Treatment Plant. (Seigfried at 76-77, 157, 190; Kett at 107; Heath at 88, 129).

22. Plaintiff was satisfied with the change in his job duties. In fact, he testified that "they created this job and it was great." (Seigfried at 78, 85).

23. From 1990 through mid-2001, Plaintiff worked at the Treatment Plant on a relief basis. (Seigfried at 25).

24. Plaintiff alleges that in January, 2001, several of his Union co-workers filed a grievance alleging that Plaintiff was performing bargaining unit work at the Treatment Plant, and interfering with the vacation picks in the Maintenance Department. (Seigfried at 38-39; Kett at 108; Macri at 65-66).

25. The purported basis for the grievance was that while light-duty employees are members of the Union, the labor contract prohibits light duty employees from performing bargaining unit work. (Seigfried at 42; Heath at 130; Macri at 66; Fogarty at 65).

26. The grievance ultimately was denied. (Seigfried at 40-41).

27. Plaintiff was unaffected by the grievance or its outcome. (Seigfried at 82).

28. All members of the Union have the right to file grievances. (Seigfried at 36, 46; Kett at 108; Hendrix at 91; Fogarty at 64).

29. On April 19, 2001, the Company informed Plaintiff of its decision to relieve him of the responsibilities associated with the Treatment Plant. (Seigfried 16 - page 1).

30. After receiving Mr. Macri's April 19th letter, Plaintiff had a number of discussions with members of management regarding his new responsibilities. (Seigfried at 83).

31. Plaintiff submitted a list of "demands" for his new job. (Seigfried at 181 and Seigfried 16-page 2; Heath at 83).

32. In response, the Company gave Plaintiff a Monday-Friday schedule; the ability to set his own start times; a private office; guaranteed three (3) hours per week of overtime; an air conditioner in his own private office; and his own vacation picks and personal holidays (*i.e.,* not interfering with the Maintenance Department seniority list). (Seigfried at 180-81 and Seigfried 16 - page 2).

33. The Company also gave Plaintiff his own phone, filing cabinet, and office supplies. (Seigfried at 65).

34. He was further given the opportunity to make up 33 hours of overtime at the Treatment Plant. (Seigfried at 185).

35. Plaintiff basically was awarded all of the terms and conditions listed in his "demands". (Seigfried at 186).

36. In May 2001, after reaching an agreement with the Company, Plaintiff was relieved of his Treatment Plant responsibilities. (Seigfried at 28). In all respects this was a positive change for Plaintiff. (Seigfried at 377 and Appendix at Exhibit B attached to Defendant's Appendix to its Memorandum of Law in Support of its Motion for Summary Judgment on all Plaintiff's Claims).

37. Plaintiff was satisfied with the change in his job duties as of May, 2001 and remains satisfied with his job as it exists today. (Seigfried at 35, 219).

38. By all accounts, Plaintiff is and has been generally a good employee. On one occasion between 1988 and 1990, Plaintiff was disciplined at Lehigh. Both prior to and since that time, Plaintiff has received commendations, gift certificates, and extra days off for his performance. (Seigfried at 58).

39. Plaintiff never missed any work related to the allegations in the Complaint. (Seigfried at 302).

40. He has never been disciplined related to the allegations in the Complaint. (Seigfried at 50, 58).

41. He continues to receive contractual pay increases; his seniority is unaffected; and, his job duties and responsibilities have not been affected negatively in any way. (Seigfried at 58-59).

42. In fact, in 2001, Plaintiff actually negotiated for himself a very favorable position at the Company. (Seigfried at 65, 91-96, 180-81, 185-86).

43. Plaintiff is a content and happy employee. (Seigfried at 35, 219). He testified that he is satisfied with his job today and testified conclusively that he has "always liked [his] job." (Seigfried at 34-35, 219, 329).

### III. THE COMPANY'S POLICY PROHIBITING HARASSMENT

44. Since at least 2000, the Company has had a "zero tolerance" policy in place that prohibits harassment of any kind. (Seigfried at 106, 108 and Seigfried 3).

45. The Company provided Plaintiff with a copy of the policy in December, 2000. (Seigfried at 137 and Seigfried 2 and 3; Kett at 83 and Kett 2; Macri at 45-46).

46. Plaintiff acknowledged that he read and understood the policy. (Seigfried at 106-109).

47. The Company (*via* Plaintiff) posted an abbreviated version of the Non-Harassment policy on all of the Company's bulletin boards in 2000. (Seigfried at 134-35; Bivinghouse at 149, 156; Kett at 83-84).

48. In 2000 or 2001, Plaintiff also attended one or more classes where management explained the terms of the policy and the reporting procedure to all Lehigh employees. (Seigfried at 107).

49. Both Ms. Kett and Mr. Bivinghouse share responsibility for investigating employee complaints of harassment under the policy at Lehigh's Lansdale facility. (Kett at 33; Bivinghouse at 46).

IV. **PLAINTIFF'S COMPLAINTS OF ALLEGED HARASSMENT**

50. Plaintiff believes that he was "harassed" based on his light duty status. (Seigfried at 166, 176, 208, 318, 327-28).

51. Plaintiff's own testimony has failed to adduce any facts substantiating the alleged harasser's (or harassers') motivation. (Seigfried at 328-29).

52. Other Maintenance employees were the subjects of similar jokes and pranks over the years, none one of whom were on light duty. (Seigfried at 72-74, 142).

53. The "joking" and "pranks" in the Maintenance Department have been a long-standing tradition regardless of any employee's light duty status. (Seigfried at 72; Bivinghouse at 118; Hendrix at 66).

54. Plaintiff complained to Ms. Kett and/or Mr. Bivinghouse about alleged harassment on occasion from January, 2001 through September, 2001. (Seigfried at 65, 109, 235, 239, 291, 295, 324-25).

55. Neither Ms. Kett nor Mr. Bivinghouse ever turned Plaintiff away, regardless of how petty his complaints may have seemed. (Seigfried at 66).

56. In fact, both Ms. Kett and Mr. Bivinghouse encouraged Plaintiff to bring any issues directly to their attention. (Seigfried at 66).

57. Each time Plaintiff reported an "incident," the Company responded. (Seigfried at 178; Bivinghouse at 91).

58. Specifically, in early February, 2001, Plaintiff first complained that Mr. Heath, his Manager, changed his start time; his clipboard was looked through; his lunch kettle was disturbed; he was told by a third party that other employees looked under the hood of his truck; and, that someone clipped a job advertisement to his time card. (Seigfried at 127, 128, 131, 160; Kett 15 and 16).

59. A meeting was held with Ms. Kett, Mr. Bivinghouse, Mr. Heath, Plaintiff and his Shop Steward, Norm Green to address his complaints. (Seigfried at 129; Kett at 125; Bivinghouse at 158-59, 200-02 and Kett 15).

60. Upon investigation, it was determined that Mr. Heath had already explained to Plaintiff, in writing, that his start time was being changed due to legitimate business reasons. (Seigfried at 121-22; Heath at 106-07 and Heath 7). Mr. Heath has the managerial right to change any employee's start time. He explained to Plaintiff the reason he was changing it prior to doing so. (Seigfried at 121-22; Heath at 106-07 and Heath 7). Moreover, there was no damage to Plaintiff's truck or lunch kettle. (Heath at 30-31).

61. In any event, after that initial meeting, Mr. Heath held a series of meetings with the Maintenance employees. (Kett at 126; Heath at 9, 10, 43-44,

115). At the meetings, Mr. Heath told the Maintenance employees that they would be terminated if the Company determined that any one of them had engaged in inappropriate conduct related to Mr. Seigfried's complaints. (Heath at 51-52).

62. No employee admitted to engaging in the conduct or offered any information as to who may have engaged in the conduct about which Plaintiff complained. (Heath at 48, 51, 55, 56).

63. The next time Plaintiff alleges that he was "harassed" was on March 18, 2001, over one (1) month later, when his co-worker requested grievance forms from the Maintenance Department Shop Steward because a "light duty person [was] working six days." (Seigfried at 166 and Seigfried at 13).

64. It is not against Company policy to request grievance forms, so no employee was disciplined as a result of this complaint. (Seigfried at 166-68).

65. On April 5, 2001, Plaintiff claims he found a "high-lighted" memo attached to his time card related to work-related injuries. (Seigfried at 169 and Seigfried 14; Kett at 144).

66. There were no witnesses to this incident. (Seigfried at 169-70).

67. Plaintiff testified that he "probably took [the memo]" to Diane Kett, who responded that she would look into it. (Seigfried at 169-170; Kett at 144).

68. The Company conducted an investigation to determine who may have placed the posting on Plaintiff's time card. With no witnesses and no corroborating evidence, the Company did not discipline any employee for this "incident." (Seigfried at 170; Kett at 144-45).

69. The next incident about which Plaintiff complained occurred on April 19, 2001 when he claims that he found a forged work order on his time card. (Seigfried at 172 and Seigfried 15; Kett at 145 and Kett 25).

70. No one was present with Plaintiff when he found the work order. (Seigfried at 172).

71. Plaintiff brought the work order to the attention of Mr. Bivinghouse. (Seigfried at 174; Kett at 129; Bivinghouse 165-66).

72. This is the only occasion when the Company was able to conclusively identify the individual responsible for the conduct about which Plaintiff complained. (Seigfried at 172-75).

73. In response to Plaintiff's complaint, the Company investigated the incident and Mr. Bivinghouse confronted the Union employee he believed forged the work order. (Seigfried at 174-75; Bivinghouse at 165-67 and Kett 25).

74. The employee, Eric Rohrbach, admitted to forging Mr. Heath's initials on the work order. (Kett at 146; Bivinghouse at 57-61; Heath at 104-05).

75. Mr. Rohrbach received a written warning pursuant to the terms of the labor contract. (Seigfried at 175; Kett at 128; Bivinghouse at 152, 169-70 and Bivinghouse 1; Macri at 36-37).

76. In his over 25 years with the Company, Mr. Rohrbach had never been disciplined. (Seigfried at 176; Kett at 129).

77. Moreover, Mr. Rohrbach has never been accused of engaging in similar conduct since that time. (Kett at 130; Bivinghouse at 61).

78. Approximately one (1) month later, Plaintiff claims that someone copied and "posted" information relating to his back injury and the negotiation of

his new job (relieving him of his Treatment Plant responsibilities) and left the copies around the plant. (Seigfried at 196).

79. Once again, there were no witnesses. (Seigfried at 200).

80. Plaintiff reported the incident to Diane Kett. (Seigfried at 204).

81. Again, an investigation took place, including interviews of a number of employees, and the Company was unable to identify who was responsible for the incident. (Bivinghouse at 182-86).

82. Plaintiff claimed that on May 23, 2001 some one placed an article "Power to the Working Man" around the plant. (Seigfried at 278 and Seigfried 19).

83. Plaintiff brought the article to the attention of Ron Bivinghouse. (Bivinghouse at 173 and Kett 28; Seigfried at 279).

84. Mr. Bivinghouse investigated the incident. (Bivinghouse at 175).

85. Again, there were no witnesses and the Company was unable to obtain any proof of who was responsible. (Seigfried at 288).

86. Between January and September, 2001, on occasion, Plaintiff complained about other minor issues, all of which were immediately addressed.

87. For example, the vacation schedule and regular schedule are behind locked glass as a result of Plaintiff's complaints of tampering. (Seigfried at 250, 314).

88. Plaintiff complained that someone had moved his time card from the top to the bottom of the rack. (Seigfried at 283). As a result, Mr. Heath placed all time cards behind glass. (Seigfried at 105; Kett at 108).

89. Plaintiff claimed that someone urinated in his hard hat and on his office chair. (Seigfried at 162, 270). There were no witnesses. He received a new hard hat and a new chair. (Seigfried at 273-74).

90. Finally, Plaintiff complained that an employee cut an extension cord to the air conditioner in his office shortly after it was built for him and also disturbed papers in his office. (Seigfried at 268; Kett at 117).

91. There were no witnesses to any of these allegations and Plaintiff admits that none of his personal property was ever damaged or stolen. (Seigfried at 264-65).

92. After a full investigation into all of these incidents during the course of nine (9) months in 2001, the Company was unable to identify the individual(s) responsible for the alleged conduct. (Seigfried at 288; Hendrix at 81, 92; Bivinghouse at 70).

93. Even so, management held a number of meetings with the Maintenance employees stressing the Company's zero tolerance for "harassment" and insisting that the joking around and horseplay stop immediately. (Kett at 124; Bivinghouse at 63, 70; Heath at 9, 10, 43-44, 51-52, 53, 58-59, 60, 115, 121; Seigfried at 288; Hendrix at 81, 92).

94. During each investigation, as well as during each of the meetings, no employee admitted to any of the alleged conduct. (Seigfried at 322; Bivinghouse at 55; Heath at 48, 51, 55, 56).

95. There were no witnesses. (Seigfried at 127, 138, 131, 172, 200, 274, 285).

96. Any employee in the plant could have been engaging in the conduct about which Plaintiff had complained. (Seigfried at 130-131; Kett at 153; Heath at 48-49, 55, 56).

97. Without any witnesses or proof, the Company was unable to discipline any particular employee for the alleged misconduct. (Seigfried at 288; Hendrix at 81, 92; Bivinghouse at 70).

98. Things had been quiet for three (3) months until September 25, 2001 when Plaintiff reported that he found anti-seize (a greasy substance) on the door knob to his private office. (Seigfried at 288; Kett at 110, 127 and Kett 17; Bivinghouse at 189).

99. Plaintiff cleaned it off and complained to Ms. Kett. (Seigfried at 290).

100. An emergency meeting was held with all Maintenance employees that day. (Seigfried at 238; Kett at 110-11; Bivinghouse at 193; Heath at 108, 112; Macri at 34, 52).

101. At the September 25, 2001 meeting with the Maintenance employees, Larry Cuomo, Regional Director of Safety and Security, informed the employees that the Company and the Union agreed that if anyone was caught engaging in any inappropriate conduct, they would be terminated, and possibly could become parties to this lawsuit. (Seigfried at 238; Fogarty at 52).

102. After this meeting, Diane Kett, Ron Bivinghouse, and Larry Cuomo met with Plaintiff to communicate to him what had occurred. (Seigfried at 238-39; Bivinghouse at 196).

103. Since the meeting in September, 2001, there have been no other reports of "harassment" by Plaintiff. (Seigfried at 235, 239, 291, 295, 324-25; Bivinghouse at 107, 109-10, 128; Hendrix at 89-90; Macri at 85-87).

104. Throughout the relevant time period, the Company investigated each one of Plaintiff's complaints and took extensive measures to identify the

individual(s) responsible for the alleged misconduct. (Seigfried at 178; Bivinghouse at 91).

105. No one, including Plaintiff, was able to identify the individual(s) responsible for the conduct about which he complained (other than the Eric Rohrbach "work order" incident). (Seigfried at 178; Heath at 131).

106. Plaintiff did not raise any complaints to any manager other than Ms. Kett or Mr. Bivinghouse nor did he bring his complaints to the attention of the Company's corporate headquarters as provided by the policy. (Seigfried at 137-39, 140-41).

107. Plaintiff never filed a grievance relating to any of the allegations in the Complaint although he understood that he had the right to do so. (Seigfried at 35).

## V. PLAINTIFF'S MEDICAL RESTRICTIONS AND PHYSICAL ABILITIES

108. Upon his return to work in September, 1988, Plaintiff's treating physician, submitted a Physical Capabilities Checklist. That checklist establishes that Plaintiff's physical limitations were and still are extremely limited. For example, the doctor indicated that Plaintiff can stand one to four hours per day; sit five to eight hours per day; walk one to three hours per day; drive five to eight hours per day; and use his hands for repetitive motion such as simple grafting, pushing and pulling, and fine manipulation. Dr. Ruth also indicated that Plaintiff can use his feet for repetitive movement and could occasionally bend, squat, and climb. Finally, Dr. Ruth indicated that Plaintiff could lift up to 50 pounds maximum to below his shoulder. (Seigfried at 149-50 and Seigfried 7).

109. On April 27, 1993, Dr. Ruth submitted a note stating that Plaintiff is still under his original restrictions; "that is, limited lifting and stooping; limited driving time for delivery - 60 miles per day limit; a 40-hour work week, and eight-hour days and two consecutive days off (*i.e.,* Saturday and Sunday, or Sunday and Monday), getting help for lifting, if necessary." (Seigfried at 153-56 and Seigfried 9).

110. On August 16, 1996, Plaintiff exacerbated his back injury. His doctor's note stated that Plaintiff "may need help lifting as yet." There were no other restrictions set forth in the note. (Seigfried at 157 and Seigfried 10).

111. Finally, in connection with the negotiation of Plaintiff's new job in May, 2001 (relief of Treatment Plant responsibilities), Dr. Ruth submitted a note stating that Plaintiff was still under his original restrictions, which include assistance with lifting and restriction on bending. He further indicated that Plaintiff was able to work overtime. (Seigfried at 158-60 and Seigfried 11).

112. Since May, 2001, Plaintiff's work-related medical restrictions have not been modified.

113. Plaintiff testified that he is satisfied with the manner in which the Company accommodated his medical restrictions over the years. (Seigfried at 79).

114. Plaintiff takes anti-inflammatory medication daily and exercises as necessary. He testified that medication and exercise alleviate his back pain. (Seigfried 345, 358).

115. Plaintiff, a 60-year-old male, testified that he assists with the housework and yard work; he dresses himself and combs his own hair; he

  showers/bathes himself; he hunts and fishes; he square dances with his wife; he assists with carrying "light" grocery bags; he can "fast walk"; he bowls; he drives; he uses the riding mower to mow his lawn; he takes vacations; he has no trouble walking; and he has no difficulty reaching. (Seigfried at 240-41, 338, 339, 341, 342, 344-47, 352, 359, 360).

116.  Plaintiff never missed a day of work after his initial leave of absence due to his back injury. (Seigfried at 102, 302).

             Respectfully submitted,


             _____
             Michael G. Tierce (Pa. I.D. No. 49896)
             Lisa M. Scidurlo (Pa. I.D. No. 80487)

             Attorneys for Defendant

Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103

Dated:  July 21, 2003.

## **CERTIFICATE OF SERVICE**

I, LISA M. SCIDURLO, hereby certify that on this 21st day of July, 2003 I served a true and correct copy of the foregoing Defendant's Statement of Undisputed Facts upon Plaintiffs' counsel *via* first-class mail, postage prepaid, addressed as follows:

> Scott M. Pollins, Esquire
> 1620 Schoolhouse Lane
> Lower Gwyned, PA 19002

_____
Lisa M. Scidurlo