IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUTHER SEIGFRIED, JR., | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 02-2951 |
| | : | |
| v. | : | |
| | : | (JUDGE BAYLSON) |
| LEHIGH VALLEY DAIRIES, INC., | : | |
| | : | |
| Defendant | : | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT ON ALL PLAINTIFF'S CLAIMS**

---

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant, Lehigh Valley Dairies, Inc. ("Lehigh" or "Defendant"), has moved this Court for summary judgment on all claims asserted by Plaintiff, Luther Seigfried, ("Plaintiff" or "Seigfried"), against Defendant in this action, and now submits this memorandum of law in support thereof.

**I.    INTRODUCTION & PROCEDURAL HISTORY**

This is a case involving claims of "harassment" due to Plaintiff's alleged "disability," a 1987 work-related back injury.  On May 17, 2002, Plaintiffs, Luther Seigfried, Jr. and Lois Seigfried ("Plaintiffs"), filed the above-captioned action against Defendant, Lehigh Valley Dairies, Inc. ("Lehigh" or "Defendant"), Mr. Seigfried's current employer, alleging, *inter alia*, that Lehigh violated the American with Disabilities Act of 1990 ("ADA") and the Pennsylvania Human Relations Act ("PHRA") during Mr. Seigfried's employment at Lehigh.

Mr. Seigfried further asserted certain common law claims against Lehigh, both on his own behalf and on behalf of his wife.[1]

On July 22, 2002, Defendant moved to dismiss Counts III and IV of Plaintiff's Complaint, which asserted common law claims for Negligent Failure to Prevent a Foreseeable Harm and Loss of Consortium. On September 11, 2002, the Court granted Defendant's motion and dismissed Counts II and IV of Plaintiff's Complaint with prejudice. The only remaining claims in this case assert disability harassment under the ADA and the PHRA.[2]

**II.    FACTS**

Plaintiff has been continuously employed by Lehigh since 1979. (Seigfried at 8, 27 ). While Plaintiff was and continues to be an employee of Lehigh, he was and continues to be a member of a bargaining unit covered by a collective bargaining agreement between Lehigh and the International Brotherhood of Teamsters Union Local No. 463 ("Local 463") with whom Lehigh has had a longstanding collective bargaining relationship. (Seigfried at 14, 35). The terms and conditions of his employment, including discharge and discipline, are governed principally by the terms of the labor contract.   (Seigfried at 55, 176-77 and Seigfried 5).

**A.   Plaintiff's Employment History**

During his deposition, Plaintiff testified extensively about his 24 years of employment at Lehigh. Plaintiff's own admissions establish that the Company consistently has treated him favorably, perhaps more favorably than any other employee in the Company's history. Specifically, in 1979, the Company hired Plaintiff to work in the Cooler Department at

---

[1]    Plaintiff's federal court Complaint is attached to the transcript of his deposition as "Seigfried 24". Citations to witness depositions appear as "Witness Name at ___". Citations to exhibits to those depositions appear as "Witness Name __". For ease of reference, the complete witness deposition transcripts cited in this brief are included in the Appendix as Exhibit A, which is being submitted herewith.

[2]    As Count IV of the Complaint (loss of consortium) was the only claim asserted by Ms. Seigfried, Defendant filed an uncontested Motion to Amend the Caption of the Complaint to remove Ms. Seigfried from the caption. The Court granted Defendant's Motion. The only remaining Plaintiff in this case is Luther Seigfried.

Lehigh's Lansdale, Pennsylvania facility. (Seigfried at 12-13).[3]  On February 9, 1987, Plaintiff sustained a work-related back injury lifting a case of milk. (Seigfried at 17).  He went on a workers' compensation leave of absence until September, 1988. (Seigfried at 8, 22).  At that time, Plaintiff returned to work as a "Clerk" in the Maintenance Department, a position <u>that the Company created for him</u>. (Seigfried at 18).[4]  The Company had no obligation, contractual or otherwise, to create this job.  In the Clerk position, Plaintiff was responsible for performing non-manual work, including preparing work orders, conducting safety inspections, and posting notices throughout the Company. (Seigfried at 19).  The job duties and responsibilities associated with the Clerk position were consistent with his medical restrictions. (Seigfried at 18).

In approximately 1990, Plaintiff took over the "relief" responsibility at the Company's Water Treatment Plant. (Seigfried at 24).[5]  The Company consulted with Plaintiff's health care provider, as well as Plaintiff, prior to adding the relief responsibility to his position. (Seigfried at 75, 78, 151-52 and Seigfried 8).  This hybrid job too was created by the Company for Plaintiff. (Seigfried at 78, 85; Heath at 89).[6]  By adding the relief responsibility at the Treatment Plant, Plaintiff's seniority was unaffected and he received a pay increase. (Seigfried at 26).  He was provided with a new golf cart to travel between the main plant and the treatment plant; a foot rest; and a "helper" for any heavy lifting. (Seigfried at 76-77, 157, 190; Kett at 107;

---

[3]    By all accounts, Plaintiff is and has been generally a good employee.  On one occasion between 1988 and 1990, Plaintiff was disciplined at Lehigh.  Both prior to and since that time, Plaintiff has received commendations, gift certificates, and extra days off for his performance. (Seigfried at 58).

[4]    Dr. Richard Ruth, Plaintiff's treating physician, completed a physical capacity form in 1988 relating to Plaintiff's restrictions upon his return to work. (Seigfried at 149 and Seigfried 7).

[5]    The Treatment Plant is where the drain water from the main plant is funneled and pre-treated. (Bivinghouse at 41).

[6]    Jim Heath is employed by the Company as Maintenance Manager.  He has held this position for seventeen (17) years.  Plaintiff reports directly to Mr. Heath. (Seigfried at 62; Heath at 12-13).

Heath at 88, 129).[7] Plaintiff was satisfied with the change in his job duties. In fact, he testified that "they created this job and it was great." (Seigfried at 78, 85).

From 1990 through mid-2001, Plaintiff worked at the Treatment Plant on a relief basis. (Seigfried at 25). Plaintiff alleges that in January, 2001, several of his Union co-workers filed a grievance claiming that Plaintiff was performing bargaining unit work at the Treatment Plant, and interfering with the vacation picks in the Maintenance Department. (Seigfried at 38-39; Kett at 108; Macri at 65-66). The purported basis for the grievance was that while light-duty employees are members of the Union, the labor contract prohibits light duty employees from performing bargaining unit work. (Seigfried at 42; Heath at 130; Macri at 66; Fogarty at 65). As Plaintiff understood it, the grievance ultimately was denied. (Seigfried at 40-41). Plaintiff was unaffected by the grievance or its outcome. (Seigfried at 82).[8]

Plaintiff ultimately was relieved of his Treatment Plant responsibilities. (Heath at 91; Macri at 65-66).[9] On April 19, 2001, the Company informed Plaintiff of its decision. (Seigfried 16 - page 1; Kett at 147 and Kett 26; Macri at 72 and Macri 5). Relief of the Treatment Plant responsibilities can best be characterized as a favorable change to Plaintiff because it was the only physical work that Plaintiff was required to perform. (Heath at 87). After receiving Mr. Macri's April 19th letter, Plaintiff had a number of discussions with members of management regarding his new responsibilities. (Seigfried at 83; Heath at 83). In fact, Plaintiff submitted a list of "demands" for his new job. (Seigfried at 181 and Seigfried 16-page 2; Heath

---

[7]     Diane Kett is the Human Resources Manager at Lehigh. She has held that position for three (3) years. (Kett at 31-32). Prior to becoming Human Resources Manager, Ms. Kett held the position of Human Resources Coordinator at the Company for seven (7) years. (Kett at 32).

[8]     It is undisputed that all members of the Union have the right to file grievances. (Seigfried at 36, 46; Kett at 108; Hendrix at 91; Fogarty at 64). Therefore, there was nothing inherently wrong with the fact that Plaintiff alleges that a grievance may have been filed regarding his job duties.

[9]     James Macri is the Vice President of Operations at the Company. He has held that position for four (4) years. (Macri at 8). John Fogarty is employed by Teamsters Local No. 463 as Organizer and Business Agent. He has been the Business Agent for Lehigh since approximately 1999. (Fogarty at 12, 14).

SL1 365902v1/24659.004

at 83). After receiving his demands, the Company and Plaintiff, in consultation with his physician, negotiated the change in his job duties. By most accounts, Plaintiff was treated more favorably than any employee in the history of the Company. (Hendrix at 84; Macri 48, 64-65, 84).[10]

Specifically, the Company gave Plaintiff a Monday-Friday schedule; the ability to set his own start times; a private office; guaranteed three (3) hours per week of overtime; an air conditioner in his own private office; and his own vacation picks and personal holidays (*i.e.,* not interfering with the Maintenance Department seniority list). (Seigfried at 180-81 and Seigfried 16 - page 2; Heath at 98, 130).[11] The Company also gave Plaintiff his own phone, filing cabinet, and office supplies. (Seigfried at 65). He was further given the opportunity to make up 33 hours of overtime at the Treatment Plant. (Seigfried at 185). Plaintiff basically was awarded all of the terms and conditions listed in his "demands". (Seigfried at 186). No other Maintenance employee has ever been afforded any of the conditions of employment that Plaintiff negotiated for himself. (Seigfried at 91-96; Hendrix at 61, 64; Bivinghouse at 178-80).

In May, 2001, after reaching an agreement with the Company, Plaintiff was relieved of his Treatment Plant responsibilities. (Seigfried at 28). In all respects this was a positive change for Plaintiff as he indicated in the personal log he kept: "Last Day at the Treatment Plant. Hip-Hip-Hurrah." (Seigfried at 377 and Appendix at Exhibit B). He was

---

[10] Fran Hendrix, Plaintiff's Union co-worker, is a current employee of the Company. (Hendrix at 8). He has been employed there for 28 years and has been a Union Shop Steward since 2001. (Hendrix at 9). He testified under subpoena issued by Plaintiff's counsel. (Hendrix at 49).

[11] Plaintiff's vacation picks, which purportedly were the impetus for the January, 2001 grievance, were unaffected by the change in his job duties and responsibilities. (Seigfried at 316). In connection with picking a vacation, Mr. Hendrix, Plaintiff's Union co-worker, testified that Plaintiff "can do whatever he wants. He gets his summer off. Louie is getting the weeks he wanted." (Hendrix at 84).

satisfied with the change in his job duties as of May, 2001 and remains satisfied with his job as it exists today.  (Seigfried at 35, 219).[12]

### B.  Plaintiff's Medical Restrictions From 1990-2001.

Plaintiff's work-related medical restrictions from the time he returned to work in 1990 to 2001 are relatively unremarkable.  Indeed, the Physical Capabilities Checklist submitted by Dr. Richard R. Ruth in 1990 establishes that Plaintiff's physical limitations were and still are extremely limited.  For example, the doctor indicated that Plaintiff can stand one to four hours per day; sit five to eight hours per day; walk one to three hours per day; drive five to eight hours per day; and use his hands for repetitive motion such as simple grafting, pushing and pulling, and fine manipulation.  Dr. Ruth also indicated that Plaintiff can use his feet for repetitive movement and could occasionally bend, squat, and climb.  Finally, Dr. Ruth indicated that Plaintiff could lift up to 50 pounds maximum to below his shoulder.  (Seigfried at 149-50 and Seigfried 7).

On April 27, 1993, Dr. Ruth submitted a note, stating that Plaintiff is still under his original restrictions; "that is, limited lifting and stooping; limited driving time for delivery- 60 miles per day limit; a 40-hour work week, and eight-hour days and two consecutive days off (*i.e.,* Saturday and Sunday, or Sunday and Monday), getting help for lifting, if necessary." (Seigfried at 153-56 and Seigfried 9).

On August 16, 1996, Plaintiff exacerbated his back injury and was under Dr. Ruth's care from August 17, 1996 through August 27, 1996.  Dr. Ruth submitted a note indicating that Plaintiff "may need help lifting as yet."  There were no other restrictions set forth in the doctor's note.  (Seigfried at 157 and Seigfried 10).[13]  Finally, in connection with the negotiation of Plaintiff's new job in May, 2001 (relief of Treatment Plant responsibilities),

---

[12]    Plaintiff testified that he is satisfied with the manner in which the Company accommodated his medical restrictions over the years.  (Seigfried at 79).

Dr. Ruth submitted a note stating that Plaintiff was still under his original restrictions, which include assistance with lifting and restriction on bending. He further indicated that Plaintiff was able to work overtime. (Seigfried at 158-60 and Seigfried 11). Since May, 2001, Plaintiff's work-related medical restrictions have not been modified.

### C.  The Company's Non-Harassment Policy

There is no dispute that since at least 2000, the Company has had a "zero tolerance" policy in place that prohibits harassment of any kind. (Seigfried at 106, 108, 137; Bivinghouse at 93; Kett at 64; Macri at 30; Heath at 33-34).[14]  The policy provides in relevant part:

### HARASSMENT

Our policy is to provide a work environment that is pleasant, professional, and free from intimidation, hostility or other offenses which might interfere with work performance. We will not tolerate harassment of any sort - verbal, physical or visual-particularly against employees in protected classes. These classes include, but are not necessarily limited to race, color, religion, sex, age, sexual orientation, national origin or ancestry, disability, medical condition, marital status, veteran status, or any other status protected by law and not listed here.

Workplace harassment can take many forms. It may be, but is not limited to, words, signs, offensive jokes, cartoons, pictures, posters, e-mail jokes or statements, unwelcome invitations, pranks, intimidation, physical assaults or contact, or violence. Other

---

[13]  Plaintiff testified that, in response to this restriction, the Company always gave him a helper with any lifting associated with his relief responsibilities at the Treatment Plant. (Seigfried at 157).

[14]  In her position as Human Resources Manager, Ms. Kett is responsible for, among other things, administering the benefits for non-Union personnel, training, managing workers' compensation cases, administering 401(k) and pension benefits, and handling employment-related legal issues as they arise. (Kett at 33). She has attended a number of seminars relevant to her job duties and responsibilities in Human Resources. (Kett at 19). She was trained on the Suiza Code of Conduct in August 2000. (Kett at 22-23). She trained approximately 400 Lehigh employees on the Code of Conduct, which includes the Non-Harassment policy, in January 2001. (Kett at 24, 64).

Ronald Bivinghouse, Environmental Safety and Security Manager, assisted Ms. Kett with the Non-Harassment training. (Kett at 27). He has been employed by the Company since 1956 in a variety of different positions. (Bivinghouse at 10, 16, 33). He works with Human Resources in conducting investigations of all varieties of employee complaints, including employee complaints of "harassment". (Bivinghouse at 46). He received in-house training relative to conducting investigations. (Bivinghouse at 47).

SL1 365902v1/24659.004

prohibited conduct includes producing or distributing written or printed material of a harassing or offensive nature (including notes, photographs, cartoons or articles) and taking retaliatory action against an employee for discussing or making a harassment complaint.   Sexual harassment may include unwelcome sexual advances, requests for sexual favors, unwelcome physical contact, or other communications of a sexual nature when such conduct creates an offensive, hostile and intimidating working environment and prevents an individual from effectively performing the duties of his or her position.  It also encompasses such conduct when it is made a term or condition of employment or compensation, either implicitly or explicitly or when an employment decision is based on an individual's acceptance or rejection of such conduct.  It is important to note that sexual harassment crosses age and gender boundaries and cannot be stereotyped.   Among other perceived unconventional situations, sexual harassment may even involve two women or two men.

Sexual harassment may exist on a continuum of behavior. Examples include:    Touching or grabbing a person's body, particularly after that person has indicated that such physical contact is unwelcome; continuing to ask a person to socialize on-duty or off-duty when that person has indicated that he/she is not interested; displaying or transmitting sexually suggestive pictures, objects, cartoons, or posters; writing sexually suggestive notes or letter; referring to or identifying a person by a sexually provocative or derogatory name; telling sexual jokes or using sexually vulgar or explicit language; retaliation of any kind against persons who have filed or supported a complaint of sexual harassment (e.g., ostracizing the person, pressuring the person to drop or not support the complaint, adversely altering that person's duties or work environment, etc.); derogatory or provoking remarks about or relating to a person's gender, harassing acts or behavior directed against a person on the basis of his or her gender or sexual orientation, and off-duty conduct which falls within the definition of sexual harassment and affects the work environment.

If you are harassed, we encourage you to complain directly to the alleged harasser, and make it clear that the harasser's behavior is unacceptable, unwelcome and offensive and must stop immediately.  However, it is not required that you do so.  It is essential that you report the harassment to your supervisor, your local human resources manager, our Ethics Compliance Officer or our General Counsel according to the procedures set forth on page 21 of this Code of Business Conduct.

******************

## REPORTS OF VIOLATIONS

Reporting known or suspected violations of our Code of Business Conduct is a sensitive issue.  However, you recognize that violations could have a profoundly adverse effect on our investors, our customers, our consumers and the livelihoods of all of us. Therefore, you must promptly report all questionable conduct or violations (or suspected violations) of this Code of Business Conduct.  No disciplinary or other retaliatory action will be taken against any employee as a result of reporting any suspected violation.

The preferred option for reporting violations of this Code of Business Conduct is for you to talk to your immediate supervisor or your local human resources manager.  If you do not feel comfortable discussing the matter at that level, you should call our Ethics Compliance Officer (800-431-9214), or our General Counsel (800-431-9214).

If an employee reports a known or suspected violation of this Code of Business Conduct to you as a supervisor or manager, you must immediately pass that report along to our Ethics Compliance Officer (800-431-9214) who will investigate the report.

(Seigfried 3).

Plaintiff first was provided with a copy of the policy in December, 2000. (Seigfried at 137 and Seigfried 2 and 3; Kett at 83 and Kett 2; Macri at 45-46).  He acknowledged that he read and understood the policy.  (Seigfried at 106-109).  The Company (*via* Plaintiff) posted an abbreviated version of the Non-Harassment policy on all of the Company's bulletin boards in 2000.  (Seigfried at 134-35; Bivinghouse at 149, 156; Kett at 83-84).  The policy remains posted to date.  In 2000 or 2001, Plaintiff also attended one or more classes where management explained the terms of the policy and the reporting procedure to all Lehigh employees.  (Seigfried at 107).  There can be no question that Plaintiff was aware of the policy and understood its terms.

### D.  Plaintiff's Complaints of "Harassment"

By Plaintiff's own admission, Plaintiff's complaints of harassment are essentially limited to the time period of January, 2001 and September, 2001. (Seigfried at 295, 324-25).  It

appears that the "problems" began after the alleged January, 2001 "vacation pick" grievance was filed. (Seigfried at 106; Bivinghouse at 49). This is supported by the testimony of Plaintiff's Union co-worker, Fran Hendrix. (Hendrix at 28, 29, 62, 76). A close look at Plaintiff's allegations demonstrate the pettiness of most, if not all, of his complaints. Even so, each time Plaintiff complained, management investigated his allegations and took prompt, appropriate action. The following summarizes Plaintiff's account of the chronology of events:

Shortly after the "vacation pick" grievance was filed and after all Lehigh employees received training on the Suiza Code of Conduct, Plaintiff complained to Ms. Kett that he felt he was being "picked on." (Seigfried at 120; Kett at 106). Specifically, in early February, 2001, Plaintiff complained that Mr. Heath, his Manager, changed his start time; his clipboard was looked through; his lunch kettle was disturbed; he was told by a third party that other employees looked under the hood of his truck; and, that someone clipped a job advertisement to his time card. (Seigfried at 127, 128, 131, 160; Kett 15 and 16).[15]

A meeting was held with Ms. Kett, Mr. Bivinghouse, Mr. Heath, Plaintiff and his Shop Steward, Norm Green to address his complaints. (Seigfried at 129; Kett at 125; Bivinghouse at 158-59, 200-02 and Kett 15). Upon investigation, it was determined that Mr. Heath had already explained to Plaintiff, in writing, that his start time was being changed due to legitimate business reasons. (Seigfried at 121-22; Heath at 106-07 and Heath 7).[16] Moreover, it was determined that Plaintiff's lunch kettle was not damaged nor was his truck. (Heath at 31-33). In any event, after that initial meeting, Mr. Heath held a series of meetings with the Maintenance employees. (Kett at 126; Heath at 9, 10, 43-44, 115). At the meetings,

---

[15]   It is common for employees to communicate with each other by placing notes and other documents on timecards, particularly if the employees are on different shifts. (Macri at 38).

[16]   Mr. Heath has the managerial right to change any employee's start time. He explained to Plaintiff the reason he was changing it prior to doing so. (Seigfried at 121-22; Heath at 106-07 and Heath 7). This, like many other of Plaintiff's allegations, has absolutely no legal merit.

SL1 365902v1/24659.004

Mr. Heath told the Maintenance employees that they would be terminated if the Company determined that any one of them had engaged in inappropriate conduct related to Mr. Seigfried's complaints. (Heath at 51-52). No employee admitted to engaging in the conduct or offered any information as to who may have engaged in the conduct about which Plaintiff complained. (Heath at 48, 51, 55, 56). In fact, most, if not all, of Plaintiff's allegations have not been corroborated by any witnesses. (Seigfried at 127, 138, 131, 172, 200, 274, 285).

The next time Plaintiff alleges that he was "harassed" was on March 18, 2001, over one (1) month later, when his co-worker requested grievance forms from the Maintenance Department Shop Steward because a "light duty person [was] working six days." (Seigfried at 166 and Seigfried at 13). Plaintiff assumed that this request was related to him. However, it is not against Company policy to request grievance forms, so no employee was disciplined as a result of this complaint. (Seigfried at 166-68).

On April 5, 2001, Plaintiff claims he found a "high-lighted" memo attached to his time card related to work-related injuries. (Seigfried at 169 and Seigfried 14; Kett at 144). Plaintiff had posted the unaltered "Work-Related Injuries" memorandum on all Company bulletin boards.[17] He claims that the memo attached to his time card high-lighted the section regarding the "temporary" nature of the modified duty program (of which Plaintiff is not even a part). He believes that the document was placed on his time card because he is on light duty. (Seigfried at 170). There were no witnesses to this incident. (Seigfried at 169-70).

Plaintiff testified that he "probably took [the memo]" to Diane Kett, who responded that she would look into it. (Seigfried at 169-170; Kett at 144). Ms. Kett explained to him that his job had nothing to do with the Company's modified duty program, which went into

---

[17] Many of the allegations of the complaint involve a series of "postings" from January, 2001 through September, 2001. (Bivinghouse at 54). Coincidentally, Plaintiff has had primary responsibility for putting up postings around the plant since the late 1980's. (Seigfried at 32, 235; Kett 85).

effect years after Plaintiff's injury. (Kett at 144). The Company conducted an investigation regarding who may have placed the posting on Plaintiff's time card. With no witnesses and no corroborating evidence, the Company did not discipline any employee for this "incident." (Seigfried at 170; Kett at 144-45).

The next incident about which Plaintiff complained occurred on April 19, 2001 when he claims that he found a forged work order on his time card. (Seigfried at 172 and Seigfried 15; Kett at 145 and Kett 25).[18] No one was present with him when he found the work order. (Seigfried at 172). Plaintiff believed that someone placed the work order on his time card because he was on light duty. (Seigfried at 176). He brought the work order to the attention of Mr. Bivinghouse. (Seigfried at 174; Kett at 129; Bivinghouse 165-66).

This is the only occasion when the Company was able to conclusively identify the individual responsible for the conduct about which Plaintiff complained. In response to Plaintiff's complaint, the Company investigated the incident and Mr. Bivinghouse confronted the Union employee he believed forged the work order. (Seigfried at 174-75; Bivinghouse at 165-67 and Kett 25). The employee, Eric Rohrbach, admitted to forging Mr. Heath's initials on the work order. (Kett at 146; Bivinghouse at 57-61; Heath at 104-05). He received a written warning pursuant to the terms of the labor contract. (Seigfried at 175; Kett at 128; Bivinghouse at 152, 169-70 and Bivinghouse 1; Macri at 36-37). In his over 25 years with the Company, Mr. Rohrbach had never been disciplined. (Seigfried at 176; Kett at 129). Moreover, Mr. Rohrbach has never been accused of engaging in similar conduct since that time. (Kett at 130; Bivinghouse at 61).

Approximately one (1) month later, Plaintiff claims that someone copied and "posted" information relating to his back injury and the negotiation of his new job (relieving him

of his Treatment Plant responsibilities) and left the copies around the plant.  (Seigfried at 196).

Once again, there were no witnesses.  (Seigfried at 200).  Plaintiff reported the incident to Diane

Kett.  (Seigfried at 204). Plaintiff believes that someone copied the documents because he is a

light duty employee.  (Seigfried at 208).  Again, an investigation took place, including interviews

of a number of employees, and the Company was unable to identify who was responsible for the

incident.  (Bivinghouse at 182-86).

       Plaintiff claimed that on May 23, 2001 some one placed an article "Power to the

Working Man" around the plant.  (Seigfried at 278 and Seigfried 19).[19]  He brought it to the

attention of Ron Bivinghouse.  (Bivinghouse at 173 and Kett 28; Seigfried at 279).

Mr. Bivinghouse investigated the incident.  (Bivinghouse at 175).  Again, there were no

witnesses and the Company was unable to obtain any proof of who was responsible.  (Seigfried

at 288).[20]

       Between January and September, 2001, on occasion, Plaintiff complained about

other minor issues, all of which were immediately addressed.  For example, the vacation

schedule and regular schedule are behind locked glass as a result of Plaintiff's complaints of

tampering.  (Seigfried at 250, 314).   Plaintiff complained that someone had moved his time card

from the top to the bottom of the rack.  (Seigfried at 283).  As a result, Jim Heath placed all time

cards behind glass.  (Seigfried at 105; Kett at 108).  Plaintiff claimed that someone urinated in

---

[18]   In response to the request for maintenance, the work order stated "[s]ee Lou S.  This is a Treatment Plant
Operator's job . . ."  Jim Heath's initials appeared at the bottom.  (Seigfried 15).

[19]   That anonymous article purportedly made reference to the negotiation of Plaintiff's new job out of the
Treatment Plant, and that it was unfair that the Company was treating him more favorably than full-time
employees.  (Seigfried at 19).

[20]   Mr. Hendrix also was unable to identify who had allegedly posted the "Power to the Working Man" statement.
(Hendrix at 25, 32, 37, 59).  In fact, he testified that it could have been an employee other than in the
Maintenance Department who posted it.  (Hendrix at 71).  Finding this article prompted Mr. Hendrix to
confront some Maintenance employees in his capacity as Union Shop Steward in May, 2001.  (Hendrix at
40-41).  Mr. Hendrix testified that after he confronted the employees, the incidents effectively stopped.
(Hendrix at 69).

his hard hat and on his office chair. (Seigfried at 162, 270). There were no witnesses. He received a new hard hat and a new chair. (Seigfried at 273-74). Finally, Plaintiff complained that an employee cut an extension cord to the air conditioner in his office shortly after it was built for him and also disturbed papers in his office. (Seigfried at 268; Kett at 117). Again, there were no witnesses to any of these allegations and Plaintiff admits that none of his personal property was ever damaged or stolen. (Seigfried at 264-65).

        After a full investigation into all of these incidents during the course of nine (9) months in 2001, the Company was unable to identify the individual(s) responsible for the alleged conduct. (Seigfried at 288; Hendrix at 81, 92; Bivinghouse at 70). Even so, management held a number of meetings with the Maintenance employees stressing the Company's zero tolerance for "harassment" and insisting that the joking around and horseplay stop immediately. (Heath at 43-44, 58-59, 60). During each investigation, as well as during each of the meetings, no employee admitted to any of the alleged conduct. (Seigfried at 322; Bivinghouse at 55; Heath at 48, 51, 55, 56). There were never any witnesses either. (Seigfried at 285). In fact, any employee in the plant could have been engaging in the conduct about which Plaintiff had complained. (Seigfried at 130-131; Kett at 153; Heath at 48-49, 55, 56). Without any witnesses or proof, the Company was unable to discipline any particular employee for the alleged misconduct.

### E.   The September 25, 2001 Meeting with the Maintenance Employees.

        Three (3) months had passed without any major incidents. The final incident occurred in September, 2001 when someone had placed anti-seize on Plaintiff's office door handle. (Seigfried at 288; Kett at 110, 127 and Kett 17; Bivinghouse at 189).[21] Plaintiff cleaned it off and complained to Ms. Kett. (Seigfried at 290). Frustrated because "things had been quiet

---

[21]   Anti-Seize is a lubricant used in machine shops. (Hendrix at 42-43; Bivinghouse at 191).

for awhile" prior to this incident, Ms. Kett contacted Mr. Macri and Larry Cuomo (the Company's Regional Director of Safety).  (Kett at 128).  As a result of this complaint, management immediately held a group meeting with all of the Maintenance employees.  (Kett at 110-11; Bivinghouse at 193; Heath at 108, 112; Macri at 34, 52).  All of the attendees were required to sign in.  (Kett at 112 and Kett 14).  Mr. Cuomo, Mr. Bivinghouse and Ms. Kett all spoke at the meeting.  (Kett at 111).  The purpose of this meeting, according to Mr. Bivinghouse, was to "warn the maintenance department of the seriousness of these actions . . . and that disciplinary action would be taken against anybody that was found, and to anybody that was working with or hiding any information pertaining to these incidences [sic]".  (Bivinghouse at 193).

Even though there was no proof that the Maintenance employees were responsible for the "anti-seize" incident, to send yet another message, the Company issued all of the employees a verbal warning.  (Bivinghouse 2).  At the meeting, Mr. Cuomo informed the employees that the Company and the Union had agreed that if anyone was caught engaging in any inappropriate conduct, they would be terminated, and possibly could become parties to this lawsuit.  (Seigfried at 238; Fogarty at 52).  After this meeting, Diane Kett, Ron Bivinghouse, and Larry Cuomo met with Plaintiff to communicate to him what had occurred.  (Seigfried at 238-39; Bivinghouse at 196).  Plaintiff testified that the situation improved after that meeting.  (Seigfried at 239, 291, 295).  In fact, since the meeting in September, 2001, there have been no other reports of "harassment" by Plaintiff.  (Seigfried at 295, 324-25; Bivinghouse at 128; Hendrix at 89-90; Macri at 85-87).

SL1 365902v1/24659.004

### III. SUMMARY OF ARGUMENT

Defendant is entitled to summary judgment on Counts I and II of the Complaint for the following reasons:  First, Plaintiff's own admissions establish that he is not "disabled" as a matter of law.  Because Plaintiff has failed to establish that his 1987 work-related back injury substantially limits one or more of his major life activities, his claim fails.  Second, even if Plaintiff could meet this burden (which Defendant denies), Plaintiff cannot prove that he was "harassed" *because of* any alleged disability.  Plaintiff testified that he believes that he was "picked on" because of his light duty status.  Simply being on "light duty" is not a class protected by the ADA.  Moreover, Plaintiff's own testimony demonstrates that he was not picked on for this reason, as others in his department were the subject of similar horseplay, pranks and jokes without regard to their light duty status.

Third, even if Plaintiff could establish this causal connection between the jokes and pranks and any alleged disability (which again Defendant denies), Plaintiff failed to show that the events he has alleged were severe or pervasive enough to alter the terms and conditions of his employment.  Given controlling case law, Plaintiff's complaints, when taken individually or collectively, fail to rise to the level of severity or pervasiveness to state a hostile work environment claim.  Moreover, Plaintiff never lost a day of work because of the allegations in the Complaint.  To the contrary, the Company and the Union agreed to award him more favorable working conditions than any other Maintenance Department employee in the Company's history.  Defendant is entitled to summary judgment on this basis as well.

Finally, and in any event, Defendant took adequate remedial measures required by law that were reasonably calculated to end the alleged "harassment."  Each time Plaintiff complained about an incident, no matter how petty, Defendant investigated it and responded.  On the one occasion when an employee admitted forging a work order, that employee was

disciplined consistent with the labor contract.  The Company repeatedly conducted meetings with employees re-affirming the Company's policy against harassment throughout this time period as well.  The conduct ultimately ceased.  Therefore, because the Company took adequate remedial measures required by law that were reasonably calculated to end the alleged "harassment," (and, as Plaintiff admits, did end the harassment), there can be no respondeat superior liability.   The Company is entitled to summary judgment on this basis as well.  These arguments are set forth in greater detail below.

IV.  **ARGUMENT**

  **A.  Standard of Review**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Unless evidence in the record would permit a jury to return a verdict for the non-moving party, there are no issues for trial, and summary judgment becomes appropriate.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, (1986). In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion.  *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3rd Cir. 1995).

The party opposing the summary judgment motion must come forward with sufficient facts to show that there is a genuine issue of material fact.  *Celotex Corp v. Catrett,* 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).  Indeed, to defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials.  *Id.,* 477 U.S. at 321 n. 3 (quoting Fed. R. Civ.

SL1 365902v1/24659.004

P. 56(e)); see also *First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Insur. Co.*, 824 F.2d 277, 282 (3rd Cir. 1987). Finally, the non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248-49. Plaintiff cannot meet this burden here.

### B.   Defendant Is Entitled To Summary Judgment On All Plaintiff's Claims.

A claim for harassment based on an alleged disability requires a showing that the plaintiff is an otherwise qualified individual with a disability under the ADA; that he was subjected to unwelcome harassment; that the harassment was based on his disability; that the conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment; and, that the employer knew or should have known of the harassment and failed to take prompt remedial action to correct the situation. *Walton v. Mental Health Assoc.*, 168 F.3d 661 (3d Cir. 1999).[22] For the reasons set forth fully below, Plaintiff's own admissions establish that he can not come close to meeting his burden of proof in this case. Therefore, because there is no triable issue of fact, summary judgment on all Plaintiff's claims is proper.

#### 1.   Plaintiff Is Not Disabled As A Matter Of Law.

As a threshold matter, to survive summary judgment, an ADA plaintiff must first demonstrate that he is "disabled" within the meaning of the Act, and that this "disability" existed at the time of the alleged act(s) of alleged harassment. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138 (3d Cir. 1998); *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 884 (6th Cir. 1996). Oftentimes, particularly in cases involving back injuries, the Court's inquiry ends here. *See e.g., Buskirk v. Apollo Metals*, 116 F. Supp. 2d 591 (E.D. Pa. 2000) (holding that the plaintiff's work-related back injury did not

---

[22]   In addition to his claims under the ADA, Seigfried asserts, in Counts IV and V, separate claims under the PHRA. No separate discussion of Seigfried's claims under the PHRA is provided, inasmuch as analysis of an ADA claim applies equally to a PHRA claim. *Kelly v. Drexel University,* 94 F.3d 102, 105 (3rd Cir. 1996).

render him "disabled" as a matter of law); *Coker v. Tampa Port Authority*, 962 F. Supp. 1462 (M.D. Fla. 1997) (finding that because plaintiff failed to demonstrate that his back injury constituted a disability, the court need not determine whether the plaintiff was otherwise qualified for the position under the Act). As in *Buskirk* and *Cocker,* this Court's inquiry certainly should end here in this case because, as established herein, Plaintiff's extensive testimony conclusively establishes that he is not "disabled" as a matter of law.

As defined under the ADA, a disability is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff alleges that he is an individual with a disability under the first prong of the definition. [Seigfried 24 at ¶¶ 19, 28]. A physical impairment is:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss effecting one or more of the following body symptoms: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine.

29 C.F.R. § 1630.2(h). Most courts agree that a back injury constitutes a physical impairment within the meaning of the Act and its implementing regulations. *See Rondon v. Walmart Inc*., No. C-97-0369, 1998 U.S. Dist. LEXIS 16137 (N.D. Cal. October 8, 1998) (finding that the plaintiff's back strain qualifies as a physical impairment); *Whitfield v. Pathmark Stores, Inc.*, 971 F. Supp. 851 (D. De. 1997) (same); 29 C.F.R. § 1630.2(h).[23] However, the Supreme Court has emphasized that simply having an impairment does not necessarily equate to being "disabled" as a matter of law. The plaintiff has the additional burden of showing that he in fact suffered from a substantial limitation in a major life activity as a result of the impairment. *Sutton v. United Airlines*, 527 U.S. 471, 482 (1999). The substantial limitation must be present – not

SL1 365902v1/24659.004

potential or hypothetical. *Id.* Plaintiff's own testimony establishes that his 1987 back injury does not substantially limit one or more of his major life activities as compared to the general population.

As a threshold matter, simply being classified as a "light duty" employee as the result of a back injury is not a disability as a matter of law. *Panzullo v. Modell's Pa. Inc.,* 968 F. Supp. 1022, 1024 (E.D. Pa. 1997); *see also Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996); *Aucutt v. Six Flags Over Mid-America*, 85 F.3d 1311, 1319 (8th Cir. 1996). During his deposition, Plaintiff testified extensively that he believes that he was picked on because of his "light duty" status. (Seigfried at 166, 176, 208, 318, 327-28). As being on "light duty" is not in and of itself a "disability," Plaintiff must adduce additional evidence establishing that he is "disabled" under the ADA. As set forth below, his own deposition testimony establishes that he cannot do so.

The Court must determine whether Plaintiff's alleged physical impairment - the back injury resulting in certain work-related restrictions, such as lifting - "substantially limits one or more of the major life activities . . ." sufficient to constitute a "disability" within the meaning of the Act. *See* 42 U.S.C. § 12102(2). A "major life activity" is defined by the regulations as encompassing such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working." 29 C.F.R. § 1630.2(I). Running, jumping, climbing stairs and ladders, and crawling are not sufficiently significant or essential functions to qualify as major life activities under the ADA. *Compare* 29 C.F.R. § 1630.2(h)(2)(i) ("functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working constitute major life activities under the ADA"). Various athletic activities such as driving, performing household chores, working on cars, golfing, gardening,

---

[23]    All of the unpublished cases cited in this brief are included in the Appendix as Exhibit C.

shoveling snow, and mowing the lawn also are not major life activities under the ADA. *Buskirk*, 116 F. Supp. 2d at 598.

As relevant here, Plaintiff's deposition testimony suggests that he is claiming that he is limited in the major life activities of "stooping," "lifting" and/or "bending" and perhaps "performing manual tasks." As set forth below, because Plaintiff has failed to prove that any of his major life activities are "significantly" restricted by his alleged symptomatology, Plaintiff is not disabled within the ADA.

Indeed, as a threshold issue, on a motion for summary judgment, courts have consistently required that a plaintiff show not only a restriction but a "significant restriction" on a major life activity in order to be disabled under the ADA. *Popko v. The Pennsylvania State University*, 994 F. Supp. 293 (E.D. Pa 1998); *see Horth v. General Dynamics*, 960 F. Supp. 873, 878 (M.D. Pa. 1997) (holding that even though plaintiff could not sit for more than two (2) hours, walked with a limp, and had a 20-pound lifting restriction, his restrictions were comparatively moderate, and therefore, he was not disabled within the meaning of the ADA); *Whitfield*, 971 F. Supp. at 853-58 (granting summary judgment, holding injuries restricting lifting, "repeated reaching, bending, stooping, driving, riding in a car or playing sports," fell on the common place as opposed to the "severe"); *Kirkendall v. United Parcel Serv., Inc.*, 964 F. Supp. 106, 110 (W.D.N.Y. 1997) (granting summary judgment, holding restrictions on skiing, football, tennis, basketball, bowling "do not substantially limit a major life activity"); *Ouzts v. US Air, Inc.*, C.A. No. 94-625 1996 U.S. Dist. LEXIS 11610, at *34 (W.D. Pa. July 26, 1996) (granting summary judgment for employer, holding that the plaintiff's testimony failed to establish that she was substantially limited in a major life activity).

Plaintiff has not put forth the requisite evidence that he is substantially limited with respect to any major life activity. In general, "substantially limited" refers to an inability to

perform a major life activity as compared to the average person in the general population, or a significant restriction "as to the condition, manner, or duration" under which an individual can perform the particular activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). This principle had been relied upon and articulated by the courts as well. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002) (holding that the concept of "significant limitation" should be construed narrowly in the ADA analysis); *see also e.g., Kelly v. Drexel University,* 94 F.3d 102 (3rd Cir. 1996), *reh'g denied*, 1996 U.S. App. LEXIS 24890 (September 20, 1996) (plaintiff who walked slowly and used a handrail when climbing stairs is not substantially limited in the major life activity of walking); *Nerosa v. Storecast Merchandising Corp.*, C.A. No. 02-440 2002 U.S. Dist. LEXIS 16210 (E.D. Pa. August 28, 2002) (holding that the plaintiff's inability to engage in strenuous heavy lifting, pulling and pushing did not render her disabled compared to the general population).

Moreover, medication and other measures taken to correct or mitigate an impairment must be taken into account when determining whether an individual is substantially limited in a major life activity and is thus disabled within the meaning of the ADA. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). Plaintiff takes anti-inflammatory medication daily and exercises as necessary. He testified that his medication and exercise alleviates his back pain. (Seigfried 345, 358). The Court must consider these remedial measures in its analysis of whether Plaintiff is substantially limited in any major life activity. *Sutton*, 527 U.S. at 482.

In light of Plaintiff's own testimony regarding the mitigating measures he uses to alleviate any alleged back pain, as well as his testimony regarding his own very limited medical limitations relating to his back injury, it is clear that Plaintiff is not substantially limited in any major life activity as compared to the general population. Therefore, for the reasons fully set forth below, Defendant is entitled to summary judgment on this basis.

(a) **Plaintiff's Lifting Restriction Does Not Establish That He Is Disabled Under The ADA.**

Under controlling case law, Plaintiff's 20-50 pound lifting restriction fails to establish that he is substantially limited in the major life activity of lifting as compared to the general population. *Marinelli v. City of Erie*, 216 F.3d 354, 363 (3d Cir. 2000). Specifically, the EEOC and several courts have stated that some capacity to lift is of central importance to most people's daily lives. Appendix to 29 C.F.R. § 1630.2(i); *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170 (10th Cir. 1996). However, as will be discussed below, "heavy lifting" has consistently not been viewed as a major life activity. Indeed, "a limitation on the ability to lift . . . does not substantially limit an individual from performing activities of central importance to most people's daily lives." *Id.*

In assessing the effect of a plaintiff's lifting restrictions on his or her status as an individual with a disability, a number of courts have held that lifting restrictions far worse than Plaintiff's are not substantially limiting. *See e.g., Mellon v. Federal Express Corp.*, 239 F.3d 954, 957 (8th Cir. 2001) (15-pound lifting restriction and requirement that the plaintiff avoid stress to arm is not a disability); *Marinelli* , 216 F.3d at 363 (3d Cir. 2000) (10-pound lifting restriction not significant enough to substantially limit a major life activity); *Sherrod v. American Airlines,* 132 F.3d 1112, 1120 (5th Cir. 1998) (holding that a flight attendant's restriction to lifting 45 pounds occasionally and 20 pounds frequently showed "only that she is limited from *heavy* lifting, not the routine duties of daily living."); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997) ("general lifting restriction imposed by physician, without more, is insufficient to constitute a disability"); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996), *cert. denied*, 1997 U.S. LEXIS 3270 (May 27, 1997); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996); *Buskirk*, 116 F. Supp. 2d at 597 (permanent lifting restriction of 40 pounds insufficient to establish "substantial limitation" as a matter of law);

*Sharkey v. Federal Express Corp.*, C.A. No. 98-3351 2001 U.S. Dist. LEXIS 72 at *17 (E.D. Pa. January 9, 2001).

For example, in *Buskirk*, the plaintiff alleged that he was substantially limited in the major life activity of lifting among a number of others, and that by terminating him, the defendant violated the ADA. 116 F. Supp. 2d at 597. As relevant here, the plaintiff in *Buskirk*, had a permanent lifting restriction of 40 pounds. Relying on the Third Circuit's decision in *Marinelli*, the Court found that even though over the years the plaintiff was subjected to more significant lifting restrictions, "none of these restrictions was of such duration or long-term impact that it could reasonably be considered 'substantially limiting'." *Id.* (citing 29 C.F.R. § 1630.2(j)). The Court further ruled that "[m]ore significantly, at no relevant time did any of Buskirk's many doctors ever impose a lifting restriction of less than 10 pounds. Under the prevailing view of this Circuit, such restrictions do not, as a matter of law, constitute substantial limitations in the major life activity of lifting." *Id.* (citing *Marinelli*, 216 F.3d at 364).

Other courts have reached similar results. *See, e.g., Colwell v. Suffolk Cty. Police Dep't,* 153 F.3d 635, 641 (2d Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999) (inability to engage in heavy listing not an ADA disability); *Thompson v. Holy Family Hospital*, 121 F.3d 537, 540 (9th Cir. 1997) (nurse not substantially limited in performing any major life activity even though restricted from lifting more than 25 pounds on a continuous basis, more than 50 pounds twice a day, and more than 100 pounds once a day); *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir. 1996) (as a matter of law, a 25-pound lifting limitation "does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"), *cert. denied,* 117 S. Ct. 1844, 137 L. Ed. 2d 1048 (1997); *Arcutt v. Six Flags Over Mid-America, Inc.,* 85 F.3d 1311, 1319 (8th Cir. 1996) (25-pound weight lifting restriction did not substantially limit any major life activities); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.

1996) (where plaintiff could lift and reach so long as he avoided heavy lifting, he was not

substantially impaired); *Glozman v. Retail, Wholesale & Chain Store Employees Union,*

*Local 338*, 204 F. Supp. 2d 615, 623 (S.D. N.Y. 2002) (inability to lift in excess of 10 pounds or

sit for an extended period of time does not constitute a substantial limitation on a major life

activity); *Alexander v. The Northland Inn*, C.A. No. 00-2035 2002 U.S. Dist. LEXIS 2688

(D. Minn. February 15, 2002) (restrictions on lifting no more than 10 pounds; repetitive lifting or

carrying; bending more than 35 degrees; and heavy or repetitive pushing or pulling do not

constitute a substantial limitation on a major life activity).

   The numerous cases cited above establish conclusively that Seigfried is not now,

nor has he ever been, substantially limited due to his lifting restriction and has been able to

perform a myriad of other tasks as well as hold continuous employment at Lehigh. (Seigfried at

349). In most, if not all of the cases, courts have held that restrictions <u>far more limiting</u> than

Plaintiff's do not rise to a "substantial limitation" in that activity as a matter of law. Plaintiff's

physician, Dr. Ruth, submitted Plaintiff's initial medical restrictions to the Company in 1990.

These restrictions included instructions that Plaintiff could lift up to 50 pounds maximum to

below his shoulder. (Seigfried at 149 and Seigfried at 7). While Plaintiff's other medical

restrictions have been modified over the years, there is no medical documentation demonstrating

that Plaintiff's lifting restriction has been modified to date. (Seigfried 9 and 10). Plaintiff,

however, testified that he works under a 20-50 pound lifting restriction. (Seigfried at 77). Even

taking Plaintiff's testimony as true (which is different from his documented medical restrictions),

and assuming that Plaintiff works under a permanent 20-50 pound lifting restriction, Plaintiff is

not substantially limited in the major life activity of lifting under the case law set forth above.

Therefore, Plaintiff has failed to prove that he is substantially limited in the major life activity of

lifting. Because Plaintiff is not disabled as a matter of law, summary judgment is proper on this basis.

      **(b)**   **Plaintiff's Alleged Bending Restriction Is Not A Disability Under the ADA.**

Plaintiff's testimony tends to suggest that he is also claiming that he is substantially limited in the activity of "bending." (Seigfried at 97). Bending restrictions that are work related, as well as other restrictions on walking, sitting, pushing and pulling, are rarely severe enough to rise to the level of being a "disability" as a matter of law. *Chandler v. American Eagle Airlines*, 251 F. Supp. 1173 (E.D. N.Y. 2003); *see Alexander v. The Northland Inn*, C.A. No. 00-2035 2002 U.S. Dist. LEXIS 2688 (D. Minn. February 15, 2002) (restrictions on lifting no more than 10 pounds; repetitive lifting or carrying; bending more than 35 degrees; and heavy or repetitive pushing or pulling do not constitute a substantial limitation on a major life activity).

For example, in *Chandler*, the plaintiff sustained lower back and leg injuries at work and was placed under a 15-pound lifting restriction and light duty work. 251 F. Supp. at 1174. Upon further treatment and after an extended leave of absence, it was discovered that the plaintiff suffered from partial spinal bifida and disc degeneration. He was eventually returned to work with a 10-pound lifting restriction as well as a restriction on bending. In the *Chandler* case, the Court rejected the plaintiff's arguments that he was disabled, finding that the medical evidence established that he was not substantially limited in performing any activities compared to the general population at the time he was returned to work light duty. In doing so, the Court ruled that minor impediments of one's ability to engage in life activities is fatal to an ADA claim. *Id.* The same result is appropriate here.

Indeed, moderate difficulty in engaging in certain activities at certain times is insufficient to establish that Plaintiff is substantially limited in the activity of bending. Plaintiff's

SL1 365902v1/24659.004

initial medical restrictions limited his "bending" to occasionally. (Seigfried at 7). This restriction has never been modified. The Company has complied with Plaintiff's work-related restrictions in connection with "bending" on the job. (Seigfried at 39). Off the job, Plaintiff testified that he sometimes has a difficult time bending over to brush his teeth or tie his shoes. (Seigfried at 97). As set forth above, simply because Plaintiff testified that he has some difficulty bending (to brush his teeth, for example), this claim is insufficient to establish that he is substantially limited in the activity of "bending" compared to the general population as a matter of law. Therefore, to the extent that Plaintiff claims that he is substantially limited in the major life activity of bending, his claim fails.

(c) <strong>Plaintiff's Is Not Substantially Limited In His Ability To Perform Manual Tasks.</strong>

Again, Plaintiff's testimony seems to suggest that he is claiming that he is substantially limited in the major life activity of caring for himself or performing manual tasks. (Seigfried at 96-97). Plaintiff's own testimony establishes that this claim is simply untrue. Specifically, the United States Supreme Court has found that moderate difficulty in engaging in certain activities at certain times is insufficient to establish that Plaintiff is substantially limited in the major life activity of caring for himself or performing manual tasks. *Williams*, 534 U.S. 184, 198 (2002). The *Williams* Court made clear that "terms [such as "substantially limits" and "major life activities"] need to be interpreted strictly to create a demanding standard for qualifying as disabled." This standard is objective. *Id.*; *see also Fallon v. John Ashcroft*, C.A. No. 00-5258 2002 U.S. Dist. LEXIS 12202 (E.D. Pa. January 25, 2002), *aff'd,* 2003 U.S. App. LEXIS 8277 (3d Cir. April 30, 2003). The inquiry focuses on whether the impairment places "severe restrictions in the activities that are of *central* importance to most people's daily lives." *Id.* (emphasis added).

In the *Fallon* case, for example, the plaintiff alleged that his recurring back problem caused him to use back supports when sitting on chairs and caused him pain bending over. Relying on the principles set forth in *Williams,* the Court ruled that the plaintiff failed to establish a *substantial* limitation in performing manual tasks. In doing so, the Court stated "[w]e doubt whether such impairments are of the type that could be objectively seen as substantially limiting . . . ." *Id.* at *35 n.15.

Similarly, in *Cella v. Villanova Univ.*, C.A. No. 01-7181 2003 U.S. Dist. LEXIS 2192 (E.D. Pa. Feb. 12, 2003), the court rejected the plaintiff's claim that he was disabled as a matter of law under the ADA. In that case, the plaintiff alleged that he was subjected to harassment due to his disability. The plaintiff suffered a work-related injury to his elbow, and was placed on light-duty status. From that point, his supervisor alleged called him derogatory names, such as "one armed bandit"; assigned him tasks that were inconsistent with his medical restrictions; overtly and unfairly criticized him on a regular basis; taunted him about his injury; and yelled at him. *Id.* After he re-injured his same arm at work, he alleged that the "harassment" continued. The Court granted summary judgment for the employer on his disability harassment claim, finding that as a threshold matter, the plaintiff's physical impairment did not constitute a "disability" as a matter of law. The Court reasoned that "the ADA requires more than a mere impairment in order to qualify as disabled; the individual also must show that such an impairment limits his or her ability to engage in a major life activity." *Id.* at *28-29.

In the *Cella* case, the plaintiff's main complaint involved his inability to lift over 10 pounds and perform tasks that require repetitive motions. The Court found that "these changes in [his] life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Id.* at 32-33 (quoting *Williams,* 534 U.S. at 198). The Court ruled that the plaintiff was

"able to bathe, comb his hair, brush his teeth, drive a car and straighten out his room" and reasoned that while he may have had some difficulty performing these tasks, he was "not rendered incapable of performing them." *Id.* at *31.

 Similarly, in *Nerosa v. Storecast Merchandising Corp.*, C.A. No. 02-440 2002 U.S. Dist. LEXIS 16210 (E.D. Pa. August 28, 2002), the plaintiff alleged that she was terminated because of her disability in violation of the ADA. Specifically, the plaintiff alleged that she suffered from several related medical conditions which she treats with prescribed medication, including chest pain, non-insulin dependent diabetes, a heart murmur, sinus tachycardia, a rapid heart rate, and shortness of breath. *Id.* at *3. The only resulting limitation identified by her was her inability to engage in heavy lifting, pushing, pulling or similar strenuous physical tasks. *Id.* Again, relying on the *Williams* mandate that a major life activity is "substantially limited" if it is affected in a "considerable" manner or "to a large degree," the Court rejected the plaintiff's claim. In reaching its decision, the Court reasoned that "[t]he inability to engage in strenuous and heavy lifting, pulling or pushing does not render Ms. Nerosa disabled. Her conclusory allegation that she has a disability is unsupported by her actual factual allegations." *Id.* The same result is appropriate here.

 Indeed, and by way of example, even long before the *Williams* decision, numerous courts have granted summary judgment for an employer when the plaintiff cannot establish that any alleged condition "substantially" limits the ability to perform manual tasks or caring for oneself. *See e.g., Morrone v. UGI Utilities, Inc.*, C.A. No. 99-36 2000 U.S. Dist. LEXIS 567 (E.D. Pa. January 27, 2000) (granting summary judgment for the employer, finding that plaintiff was not substantially limited in performing manual tasks due to his back and neck injury); *Sheppard v. Great Springs Waters of America*, C.A. No. 3:97-CV-0211-D 1998 U.S. Dist. LEXIS 4070 (N.D. Tex. March 26, 1998) (holding that plaintiff who could not perform

repetitive movements with hands; is restricted from any repetitive movement with right arm;

experiences weakness such that she cannot open doors or lift; is limited to holding objects for

extended periods of time; experiences pain and numbness on a daily basis in her right arm; and is

unable to lift her arm over her head not substantially limited in performing manual tasks); *Outzts*,

1996 U.S. Dist. LEXIS 11610 (holding that plaintiff's inability to carry items weighing only a

few pounds or grasp or manipulate items did not substantially limit ability to engage in manual

tasks); *Kahn v. Cooke County*, 1997 U.S. Dist. LEXIS 9216 (N. D. Ill. June 26, 1997) (holding

that plaintiff was not substantially limited in performing manual tasks despite inability to write

longer that 15 or 20 minutes, tie his shoes or lift more than 15 pounds); *DePaoli v. Abbott Labs*.,

1996 U.S. Dist. LEXIS 5284 (N.D. Ill. April 22, 1996), *aff'd*, 40 F.3d 668 (7th Cir. 1998)

(plaintiff who could not perform any repetitive motions with right hand not substantially limited

in performing manual tasks).

   In the present case, Plaintiff has offered absolutely no evidence to demonstrate

that he is substantially limited in his ability to perform manual tasks. Rather, Plaintiff's own

admissions clearly establish that Plaintiff is more than able to perform his manual tasks after

making -- at times -- minor adjustments to address his symptomatology. Indeed, Plaintiff's

deposition testimony conclusively shows that although he has made adjustments in the manner in

which he performs certain activities as compared to his own past performance of the same

activities, his ability to perform these activities is not "significantly restricted compared to the

general population" as required by the regulations and interpretive case law. *See id*.

Accordingly, Plaintiff has failed to establish any "substantial limitation" under the ADA.

   Plaintiff's own testimony establishes that he is not substantially limited in

performing manual tasks or caring for himself. In fact, his testimony demonstrates that he leads

a very normal life. Plaintiff, a 60-year-old male, testified that he assists with the housework and

yard work; he dresses himself and combs his own hair; he showers/bathes himself; he hunts and fishes; he square dances with his wife; he assists with carrying "light" grocery bags; he can "fast walk"; he bowls; he drives; he uses the riding mower to mow his lawn; he takes vacations; he has no trouble walking; and he has no difficulty reaching.  (Seigfried at 240-41, 338, 339, 341, 342, 344-47, 352, 359, 360).  Importantly, Plaintiff never missed a day of work after his initial leave of absence due to his back injury.  (Seigfried at 102, 302).  Perhaps, on occasion, Plaintiff has had to make minor adjustments in the manner in which he performs some of these activities (for example, his wife washes his back for him), and limit the frequency of others (for example, his bowling and square dancing).  (Seigfried at 345-47, 359).  However, as established above, the adjustments do not demonstrate a "substantial limitation" as compared to the general population.  Accordingly, in light of Plaintiff's own admissions, he is not substantially limited in the performance of those tasks central to most people's daily lives.  Therefore, Plaintiff is not disabled under the ADA for this reason as well.

Because, as fully set forth above, Plaintiff has failed to prove that he is disabled as a matter of law, Defendant is entitled to summary judgment on all Plaintiff's claims on this basis.

> **2.** **In The Alternative, Plaintiff Cannot Show That He Was Harassed Because Of His Alleged "Disability."**

Even if Plaintiff could demonstrate that he is disabled as a matter of law (which Defendant denies), Plaintiff has failed to demonstrate that any of the alleged incidents that occurred from January, 2001 through September, 2001 took place *because of* his disability.  It is clear that some of his co-workers (albeit unidentified co-workers) may have had an issue with Plaintiff during the very limited relevant time period.  However, "a personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability." *Walton*, 168 F.3d at 667 (quoting *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997)).  To meet his burden in this case, Plaintiff must show that any of the alleged harassment was

inseparable from his "disability" or inescapably and irrevocably linked to his "disability."
*Johnson v. Hondo*, 125 F.3d 408, 414 (7th Cir. 1997). Plaintiff's evidence falls woefully short of
meeting this burden.

   (a)   **Plaintiff's Subjective Belief That He Was "Harassed" Because Of His Light Duty Status Is Insufficient As A Matter Of Law.**

In this case, Plaintiff testified that he believes that he was being harassed because
he is on light duty. (Seigfried at 166, 176, 208, 318, 327-28). Even assuming without admitting
"light duty" status is a protected class under the ADA for the purposes of this argument (which is
contrary to controlling caselaw), Plaintiff has provided no facts to support his subjective belief.
(Seigfried at 328-29). Courts have found that "an employee's own perceptions of the harasser's
motivations provide an ineffectual means of proving discrimination." *Pavone v. Jesse Brown*,
C.A. No. 97-3200 1998 U.S. App. LEXIS 30461 at *14-15 (7th Cir. November 25, 1998) (citing
*Rothman v. Emory Univ.*, 123 F.3d 446, 453 (7th Cir. 1997); *see also Shramban v. Aetna*, C.A.
No. 02-444 2003 U.S. Dist. LEXIS 8494 *9-10 (E.D. Pa. May 16, 2003) (plaintiff's deposition
testimony and allegations insufficient to demonstrate that inappropriate conduct was caused by
discriminatory animus); *Thakkar v. Provident Nat'l Bank,* C.A. No. 90-3907 1991 U.S. Dist.
LEXIS 18753 at *13 (E.D. Pa. December 17, 1991) (finding that employee's subjective belief of
the motive of discrimination is insufficient to state a claim). Here, Plaintiff's own testimony has
failed to adduce any facts substantiating the alleged harasser's (or harassers') motivation.
(Seigfried at 328-29). Therefore, Plaintiff has failed to meet his burden of proving that he was
harassed because of his light duty status (assuming without admitting that this status is protected
by law), and summary judgment is appropriate on this basis.

**(b)** **In The Alternative, Plaintiff Was Not Singled Out For Being On Light Duty Or For Any Other Reason.**

As discussed above, light-duty status, in and of itself, is not a disability under the ADA, and therefore cannot provide the basis for a disability harassment claim. Even assuming that it is for the purposes of this argument, however, the substantial evidence and testimony in this case (including Plaintiff's own admissions) establish that Plaintiff was not singled out for this reason or any unlawful reason.

Conduct that is neutral cannot be used to support a hostile work environment claim because the ADA does not protect individuals from hostile conduct that is not based on their protected status. *See Farpella-Vrosby v. Horizon Health Care*, 97 F.3d 803, 806 n.2 (5th Cir. 1996) (sex neutral conduct cannot support a hostile work environment claim under Title VII). Indeed, harassment of an individual with a "disability" does not necessarily mean that such conduct is actionable. An insulting or demeaning remark does not necessarily rise to the level of unlawfulness simply because the remark happens to be directed at someone who is in a protected class. *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766 (4th Cir. 1997). When an equal opportunity harasser dispenses unwelcome conduct to employees both in a protected class and not, the plaintiff cannot show that any alleged "harassment" is based on his protected status. *Laird v. Cragin Fed. Bank*, C.A. No. 92C8441 1994 U.S. Dist. LEXIS 339 (N.D. Ill.), *aff'd*, 41 F.3d 1510 (7th Cir. 1994), *cert. denied*, 1995 U.S. LEXIS 2987 (June 12, 1995).

Plaintiff's failure to adduce any evidence that the incidents in this case occurred because of any alleged disability is fatal to his claim. For example, in the *Pavone* case, the Court affirmed summary judgment for the employer is a race and disability discrimination case, finding that all employees, regardless of their race and disability status, were treated equally poor. 1998 U.S. App. LEXIS 30461 at *14. In that case, both disabled employees and non-disabled employees complained of the same poor treatment. *Id.* at *14. Further, both

Caucasian and African American employees complained of the same poor treatment by the employer. *Id.* The Court, therefore, concluded that the plaintiff failed to offer any evidence that he suffered harassment *because of* either his race or his disability. *Id.* at *16-17.

Courts across the country have reached similar results. In *Brown v. William Henderson*, 115 F. Supp.2d 445 (S.D. N.Y. 2000), the plaintiff alleged that she was subjected to discrimination because of her sex in violation of Title VII. In that case, the plaintiff claimed that she was subjected to constant taunting from a group of male co-workers about an alleged affair with a male co-worker (who was subjected to even more severe and frequent taunting). Further, she was subjected to constant vulgarities and pornographic postings and graffiti directed at her. She also was subjected to threats from her co-workers as well as constant bantering over her weight. The plaintiff in *Brown* admitted that the animosity displayed by these co-workers was in large part due to a longstanding union-related personal conflict.

The *Brown* Court granted summary judgment in favor of the employer, finding that the plaintiff's "failure to adduce evidence that the conduct at issue here was based on her sex . . ." was fatal to her claim. *Id.* at 450. In doing so, the Court reasoned that the "equal opportunity harasser" escapes the purview of Title VII. *Id.* (citing *Holman v. State of Indiana*, 24 F. Supp 2d 909, 915 (N.D. Ind. 1998)); *see also Butler v. Ysleta Independent Sch. Dist.*, 161 F.3d 263, 270 (5th Cir. 1998) (sending offensive material to both men and women is evidence that the sexually charged atmosphere was not directed exclusively at women); *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (harassment to individuals of both genders is not actionable because it is not harassment because of sex). The Court further reasoned that the plaintiff repeatedly admitted that the co-workers' harassing conduct was directed to both her and the male co-worker with whom she was accused of having an affair. Therefore, according to the Court, in light of the plaintiff's own admissions regarding

the motivation of the harassers, as well as the targets of their conduct, the plaintiff's claim failed under Title VII.

There is substantial testimony and evidence in this case that supports Defendant's argument that Plaintiff has failed to establish that he was the target of any alleged conduct "because of his disability."  To the extent that Plaintiff contends that he was being singled out because of his light-duty status, his own testimony belies that belief.  The conduct at issue here was, and has been for many years, directed to employees on light duty and full duty alike.

First, Plaintiff testified conclusively that he believes that he was subjected to "harassment" by his co-workers in 2001 because he was negotiating a new job with the Company, not because of his light-duty status.  (Seigfried at 220).  This testimony contradicts Plaintiff's allegations that he was being picked on because of any reason close to constituting a "protected status."

Second, Plaintiff's testimony that he was "picked on" because of his light-duty status is further undermined by the fact that Plaintiff admitted that full-duty employees were subjected to the same sort of conduct over the years, as well that the fact that other light-duty employees had never been picked on.  (Seigfried at 141-42; 223; Bivinghouse at 75; 119; Hendrix at 96, Kett at 89).  Based on Plaintiff's own admissions, no reasonable juror could infer that Plaintiff was being singled out because of his "light-duty" status.

Indeed, other employees were the subjects of jokes and pranks over the years, none one of whom were on light duty.  (Seigfried at 72-74, 142; Hendrix at 64-66).  For example, one employee had the buttons cut off of his pants, one employee found urine on his salt bag, and other employees had the bottom of their salt bags cut.  (Hendrix at 64-65).  Another employee had tools knocked over and his tool cabinet damaged.  (Seigfried at 73-74).  Given the testimony and evidence in this case, it is clear that the "joking" and "pranks" in the Maintenance

Department have been a long-standing tradition regardless of any employee's light-duty status. (Seigfried at 72; Bivinghouse at 118; Hendrix at 66). Therefore, because Plaintiff's own admissions establish that he was not singled out because of any alleged "disability," or because of his light-duty status (assuming it was protected), Plaintiff has failed to make out a *prima facie* case of disability harassment. Defendant is entitled to summary judgment on all Plaintiff's claims on this basis as well.

**3.** **The Conduct About Which Plaintiff Complains Was Not Severe Or Pervasive As A Matter Of Law.**

Even assuming that Plaintiff is "disabled" and that he could prove that he was "harassed" because of any alleged "disability" (which Defendant denies), he cannot prove that the conduct at issue was severe or pervasive enough to alter the terms and conditions of his employment sufficient to create a triable issue of fact. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). To make this determination, the Court must look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and, whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Moreover, to prove an abusive working environment, the environment must be both subjectively and objectively hostile. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). A "series of trivial insignificant incidents are not 'severe' enough to be actionable." *Doe v. R.R. Donnelly & Sons*, 843 F. Supp. 1278, 1282 (S.D. Ind. 1994).

The ADA, like Title VII, does not authorize this Court to impose a "general civility code." *See Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). The alleged harassment at issue must be so severe as to affect a term, condition, or privilege of employment. Conduct that is sufficiently severe has been addressed as follows:

> [It] is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe and pervasive ensures that Title VII does not become a

36

> mere "general civility code." *Faragher v. Boca Raton,* 524 U.S.
> 775, 788 (1998). This requirement is regarded "as crucial, and as
> sufficient to ensure that courts and juries do not mistake ordinary
> socializing in the workplace - such as male-on-male horseplay or
> intersexual flirtation- for discriminatory 'conditions of
> employment.'" *Oncale v. Sundowner Offshore Servs., Inc.*
> 523 U.S. 75, 81 (1998).

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied,* 2001 U.S.

LEXIS 212 (January 8, 2001). Indeed, "'boorish . . . and decidedly immature'" conduct does not

create an objectively hostile work environment. *Alagna v. Smithville, R-II*, 324 F.3d 975

(8th Cir. 2003).

As an initial matter, non-disability-based conduct need not be considered by the

Court in determining whether a plaintiff was subjected to severe and pervasive conduct as a

matter of law. *See Lulis v. Barnhart*, 252 F. Supp. 2d 172, 177 (E.D. Pa. 2003) (conduct at issue

was "devoid" of sexual content or suggestion; therefore, not severe); *Chrouser v. DePaul*

*University*, No. 95-C-7363 1998 U.S. Dist. LEXIS 8179 (N.D. Ill. May 20, 1998) (conduct that is

not violative of Title VII need not be considered in the "severe and pervasive" analysis). Even

though it is clear that "light duty" status is not a class protected by the ADA, for the purposes of

this argument only, and taking Plaintiff's testimony as true, only three (3) to four (4) incidents

arguably could have been related to Plaintiff's light-duty status.

Indeed, at his deposition, the only fact that Plaintiff offered to support his belief

that he was being "picked on" because of his "light duty status" was the posting "Power to the

Working Man." (Seigfried at 328-29). Giving every reasonable inference to Plaintiff, and

despite Plaintiff's admission, a review of the evidence suggests that only two (2) or three (3)

other incidents could arguably be related to Plaintiff's light-duty status. Those incidents – one

involving the posting of Plaintiff's personal information in April, 2001; one involving the

high-lighted Modified Duty Posting found on his time card; and one involving an advertisement

for "back pain" posted on the Maintenance bulletin board – also occurred in 2001.  Accordingly, the evidences suggests that approximately four (4) incidents occurred over a nine (9) month period.  None have occurred in the nearly three years since.

> **(a)    Three to Four Minor Incidents Over a Discrete Nine Month Period are Insufficient as a Matter of Law.**

Giving all reasonable inferences to Plaintiff, three (3) to four (4) minor incidents arguably related to his light duty status (even if that status was protected by law) over a discrete nine (9) month period are insufficient as a matter of law to establish the requisite severity or pervasiveness.  *See e.g., Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995) (reversing jury verdict in favor of employee where nine incidents of offensive behavior over seven months were not severe, including one instance of simulated masturbation); *Lulis* 252 F. Supp. 2d at 177 (approximately 15 incidents over a one-year period, including four instances of physical touching, not severe or pervasive); *Bonora v. UGI Utilities,* C.A. No. 99-5539 2000 U.S. Dist. LEXIS 15172 (E.D. Pa. October 18, 2000) (supervisor's ten incidents of harassing conduct over two years not sufficient); *Cooper-Nicholas v. City of Chester*, C.A. No. 95-6493 1997 U.S. Dist. LEXIS 20810 (E.D. Pa. December 30, 1997) (supervisor's conduct over 19 months insufficient to establish requisite severity or pervasiveness).

Substantial case law supports Defendant's argument.  For example, in *Lulis v. Barnhart*, the plaintiff claimed that he was harassed because of his sex by his female supervisor. 252 F. Supp. 2d at 172.  In support of his claim, he testified regarding four (4) instances of brushing; four (4) instances of sitting too closely or following him; three (3) instances where he felt as though he was being propositioned; one (1) incident of being shown "personal pictures"; one instance where another employee made off-color jokes in his presence with the tacit approval of the alleged harasser; and many instances of conversations with the alleged harasser

unrelated to work.  *Id.* at 176.  These occurrences took place over a nineteen (19) month period. *Id.* at 177.

The *Lulis* Court found that the plaintiff's allegations failed to rise to the "extreme" level of conduct necessary to maintain a hostile work environment claim under Title VII.  *Id.* (citing *Faragher*, 524 U.S. at 788).  In reaching its decision, the Court reasoned that the conduct at issue "is not of a character that is so objectively offensive as to alter the 'conditions' of the victim's employment."  The Court further reasoned that "[n]one of the acts individually even approach a 'serious' level of offensiveness, and collectively they do not paint a picture of a work environment permeated with disturbing harassment." *Id.* at 176.

Further, in the *Alagna* case, which involved a claim for sexual harassment, the plaintiff charged that a co-worker repeatedly contacted her at home and at school to tell her he loved her; sent her gifts on repeated occasions; told her he was suicidal; discussed intimate details about his personal life and failed relationships; gave her romance novels; and invaded her personal space over a two (2) year period despite her constant indications both to him and her superiors that his conduct was unwelcome.  The Court affirmed the grant of summary judgment for the employer, ruling that "[c]onsidered as a whole . . . [the]conduct, however inappropriate, was not sufficiently severe or pervasive to satisfy the high threshold for actionable harm."  *Id.* at 980.

Similarly, in *Galle v. Pennsylvania Dep't of General Servs.*, C.A. No. 02-4622 2003 U.S. Dist. LEXIS 4548 (E.D. Pa. March 18, 2003), the Court granted summary judgment in favor of the employer on the plaintiff's claim of disability harassment under the ADA.  In the *Galle* case, the plaintiff suffered from epilepsy and suffered an epileptic seizure at work.  His driver's license was suspended and he was taunted by others regarding his seizure.  His computer was removed from his office; desks, chairs and a heater were removed from his work space; he

was removed from his office; his job duties changed for a short period of time; his supervisor said "I didn't wake you up, did I?"; and, he received an unfavorable job reference. *Id.* at *6-7. The Court granted summary judgment for the employer, finding that taking the instances cited by him as harassing "do not qualify as harassment which is sufficiently severe or pervasive so as to alter the working environment." *Id.* at *15 (citing *McCutchen v. Sunoco, Inc.*, C.A. No. 01-2788 2002 U.S. Dist. LEXIS 15426 at *12-13 (E.D. Pa. August 16, 2002)).

Further, in *McCutchen,* the employee contended that he was subjected to offensive comments and adverse employment actions that constituted, among other things, a hostile work environment based on his race and disability (severe keratoconus – an eye disorder that produces distortion in vision). 2002 U.S. Dist. LEXIS 15426 at *12-13. In support of his claim, the plaintiff alleged that his supervisor cut his hours; changed his schedule to interfere with his regular eye appointments; forced him to take a vacation day to see a doctor; made numerous derogatory comments, including calling him "useless"; and failed to give him favorable job assignments that were given to other employees, including operating the cash register. *Id.* at *38-40. The Court granted summary judgment in favor of Sunoco, finding that the plaintiff failed to adduce sufficient evidence to demonstrate that his work environment was severe and oppressive enough to adversely affect his work environment. *Id.*

In reaching its decision, the *McCutchen* Court reasoned that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in employment." *Id.* at *40 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). The Court found that the few insensitive comments and unfair work distribution over several years of employment did not constitute abusive conduct and were, therefore, insufficient to rise to the level of severe and pervasiveness under the law. *Id.* at *41. *See also Kay v. Independence Blue Cross*, C.A. No. 02-3157 2003 U.S. Dist. LEXIS 8521 at

*21-22 (E.D. Pa. May 16, 2003)  (holding that the plaintiff's allegations that he was subjected to constant derogatory statements because of his sex (including being called a "queer"); the subject of several anonymous letters accusing him of "staring" at men and petitions asking that he be removed from the floor; that he received several voicemails of a harassing nature, including ordering him to "get off the floor"; that he received an advertisement for a gay chat line with hand-written narrative; and that he was the subject of threats by his coworkers not sufficiently severe or pervasive to establish a claim).

        The present case is much more compelling than *Lulis* or any of the other cases cited above, as the allegations in the Complaint have not come close to the level of severity as those rejected by other Courts. *See Lulis*, 252 F. Supp 2d at 176 (allegations of physical touching; propositions, comments and non-verbal cues of a sexual nature not severe and pervasive as a matter of law).  Here, there is no testimony or evidence alleging that any of the conduct at issue involved physical touching or threats.  What we have here, taking Plaintiff's testimony as true, is simply a few jokes and/or pranks played on Plaintiff (and others) over a limited period of time not at all intended to be malicious or harmful.  Moreover, most if not all of Plaintiff's allegations are based on his unsubstantiated and uncorroborated subjective beliefs.  Even assuming that Plaintiff's testimony is true, no reasonable juror could find that the conduct at issue here rises to the level of severity and pervasiveness required by law.

        **(b)   None of The Alleged Conduct Had The Effect Of Altering The Terms Or Conditions Of Plaintiff's Employment.**

        Plaintiff's own testimony demonstrates that none of the alleged conduct had the effect of altering the terms and conditions of his employment.  His claim, therefore, fails on this basis as well.  In fact, during his entire employment history at the Company, Plaintiff has been treated fairly and in many cases more favorably than any other employee.  (Seigfried at 79, 91-96).  He is well liked by his supervisors and generally does a good job.  Indeed, by all

accounts, Plaintiff has been characterized as a good worker. (Bivinghouse at 54; Heath at 100, 132). Mr. Bivinghouse, one of Plaintiff's direct supervisors, testified that "I have absolutely no problem with Lou Seigfried. He's a – he's a good worker. He does everything I tell him. We get along great. . . . ." (Bivinghouse at 142).

Further, Plaintiff never missed any work related to the allegations in the Complaint. (Seigfried at 302). He has never been disciplined related to the allegations in the Complaint. (Seigfried at 50, 58). He continues to receive contractual pay increases; his seniority is unaffected; and, his job duties and responsibilities have not been affected negatively in any way. (Seigfried at 58-59). In fact, in 2001, Plaintiff actually negotiated for himself a much more favorable position at the Company. (Seigfried at 65, 91-96, 180-81, 185-86). Plaintiff is a content and happy employee. (Seigfried at 35, 219). He testified that he is satisfied with his job today and testified conclusively that he has "always liked [his] job." (Seigfried at 34-35, 219, 329). Others have testified to the same effect. Consider the testimony of Mr. Fogarty: "[h]e walks around smiling all the time. He's a happy guy. He always looks like somebody's treating him fair to my knowledge." (Fogarty at 69). In sum, Plaintiff has failed to show that the conduct alleged was sufficiently severe and pervasive to alter the terms and conditions of his employment. Therefore, the Company is entitled to summary judgment on this basis as well.

In sum, no reasonable jury could find that the incidents alleged were so severe or pervasive to alter the terms and condition of Plaintiff's employment. In fact, the evidence demonstrates that not only did these alleged incidents occur within a nine (9) month period (out of Plaintiff's 24 years of employment), Plaintiff was treated more favorably than any other employee during his entire employment history at the Company, including over this nine (9) month period in 2001. He has lost no time from work, nor has he suffered any adverse employment action whatsoever as a result of the allegations in the Complaint. He simply cannot

meet his burden in this case.  Therefore, Defendant is entitled to summary judgment for this reason as well.

###### 4.    Defendant Took Adequate Remedial Measures As Required By Law.

Even if Plaintiff has established actionable "harassment" because of his alleged "disability" that was severe and pervasive (which, again, Defendant denies), Plaintiff's hostile work environment claim fails because Defendant took appropriate remedial action reasonably calculated to end any alleged "harassment."  Plaintiff admits this.

In the case of co-worker harassment,[24] the United States Supreme Court has held that an employer will be held liable for such instances of co-worker harassment, if proven, if the employer knew of should have known about the harassment and failed to take reasonable steps to correct it.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633, 655 (1998).  The affirmative defense is comprised of two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*  The purpose of this defense is to encourage forethought by employers and limit actions by objecting employees.  *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2292, 141 L.Ed. 2d at 689 (1998).

An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting harassing conduct. *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997); *DeCesare v. National Railroad Passenger Corp.*, C.A. No. 98-3851 1999 U.S. Dist. LEXIS 7560 (E.D. Pa. May 24, 1999); *see also Konstantopoulos v. Westvaco Corp.* 112 F.2d 710, 716 (3d Cir. 1997) (returning employee to work with alleged harassers not sufficient to state a claim where the company took pains to

---

[24]    Plaintiff admits that he was not "harassed" by any managers or supervisors.  (Seigfried at 302).

prevent any alleged harassment by constant warnings to employees, the establishment of a

reporting procedure, and frequent manager site visits to the department).    Having an effective

grievance procedure in place -- one that is known to the victim and that stops the harassment --

will shield an employer from respondeat superior liability.  *Bouton v. BMW of N. Amer.*, 29 F.3d

103, 110 (3d Cir. 1994); *Kay,* 2003 U.S. Dist. LEXIS 8521 at *28-29.  Where, as here, the

Company had a policy in place prohibiting alleged harassment and it took reasonable steps to

investigate Plaintiff's complaints and to prevent further alleged harassment, summary judgment

is proper on this basis.  *Id.* at *29.

     **(a)**   **The Company's Actions Effectively "Stopped" The Harassment.**

As a threshold matter, the Company's action in holding the September, 2001

meeting with the Maintenance Department effectively ended the harassment.   (Seigfried at 239,

291, 295, 324-25).  A remedial action which effectively stops the harassment is adequate as a

matter of law.  *Knabe*, 114 F.3d at 412.  Because the "harassment " in the case effectively

stopped after the Company's September, 2001 meeting, by Plaintiff's own admission, Defendant

took adequate remedial action as a matter of law.  Therefore, summary judgment is appropriate

on this basis.

     **(b)**   **The Company's Actions in 2001 Were Reasonably Calculated to Stop The Harassment.**

Even if the Court finds that the Company's actions did not effectively end the

harassment (which is unsupported by Plaintiff's own admissions), Defendant is still entitled to

summary judgment because each of the actions it took from January to September 2001 in

response to Plaintiff's complaints were reasonably calculated to end any alleged harassment.

*See* e.g. *Kay*, 2003 U.S. Dist. LEXIS 8521 at *28-29 (finding that the employer's efforts in

addressing the plaintiff's complaints were sufficient as a matter of law even though the plaintiff

received another harassing voicemail message after the investigation took place).  In this case,

while the Company responded to each and every one of Plaintiff's complaints, neither the
Company nor Plaintiff nor any of his co-workers were able to conclusively identify the
individual(s) responsible for the conduct after a reasonable investigation of all but one of the
complaints.  As set forth below, however, the Company took substantial measures to do so, both
in group and individual settings.  Ultimately, the extensive measures that the Company took in
response to Plaintiff's complaints paid off as the conduct at issue ceased.

　　　　　　Specifically, it is undisputed that the Company has a policy in place prohibiting
harassment and that it communicated the policy to all employees, including Plaintiff.  (Seigfried
at 106-107 and Seigfried 2 and 3).  Plaintiff testified that he understood the reporting procedures
under the policy.  (Seigfried at 109).  Plaintiff brought all of his complaints to the attention of
Ms. Kett and Mr. Bivinghouse.  (Seigfried at 65, 109).  Neither Ms. Kett nor Mr. Bivinghouse
ever turned Plaintiff away, regardless of how petty his complaints may have seemed.  (Seigfried
at 66).  Plaintiff testified that he felt comfortable complaining either to Ms. Kett or
Mr. Bivinghouse, and that both individuals took him seriously when he complained.  (Seigfried
at 63, 324).  In fact, both Ms. Kett and Mr. Bivinghouse encouraged Plaintiff to bring any issues
directly to their attention.  (Seigfried at 66).

　　　　　　Each time Plaintiff reported an "incident," the Company responded.  (Seigfried at
178; Bivinghouse at 91).  What made the situation so difficult was that no one, including
Plaintiff, was able to identify the individual(s) responsible for the conduct about which he
complained (other than the Eric Rohrbach "work order" incident).  (Seigfried at 178; Heath at
131).  Mr. Bivinghouse testified that he had difficulty getting the Union-brothers to "rat" on each
other, creating a further obstacle to identifying the responsible individual(s).  (Seigfried at 213,
247-49; Bivinghouse at 55-56; Heath at 30-31).  As a result, the Company contacted the Union
and insisted that the Union assist it in dealing with the situation on a number of occasions.

(Seigfried at 299-300; Kett at 118; Macri at 52-56, 62-63, 69-71 and Macri 4; Fogarty at 48, 66-67 and Fogarty 2). Mr. Bivinghouse also encouraged Plaintiff to seek assistance directly from the Union. (Bivinghouse at 122). Plaintiff never filed a grievance relating to any of the allegations in the Complaint. (Seigfried at 35). [25]

The Company investigated each one of Plaintiff's complaints and took extensive measures to identify the individual(s) responsible for the alleged misconduct. (Seigfried at 178; Bivinghouse at 91). Specifically, Mr. Bivinghouse, who was generally responsible for the "legwork" in the investigatory process, spoke with many employees and potential witnesses on numerous occasions in response to Plaintiff's complaints. Frustrated at times, Bivinghouse had changed his own work hours in an effort to catch the individual responsible for the alleged incidents. (Kett at 90; Bivinghouse at 85-86). He even approached Mr. Hendrix for assistance on a couple of occasions, who essentially refused. (Bivinghouse at 82). He asked for and received guidance from both Mr. Macri and Mr. Vincent DeLuca, Director of Distribution. (Bivinghouse at 85, 104-06). He also had a number of discussions with Mr. Heath regarding stopping the "horseplay and the games." (Bivinghouse at 91).

Throughout 2001, in response to Plaintiff's complaints, management held a number of meetings with the Maintenance employees to address Plaintiff's complaints and to stress the Company's "zero tolerance" policy. (Kett at 124; Bivinghouse at 63, 70; Heath at 9, 10, 43-44, 51-52, 53, 58-59, 115, 121; Seigfried at 288; Hendrix at 81, 92). [26] In these meetings, management insisted that the joking around and horseplay stop immediately. (Heath at 43-44, 58-59, 60). During each of the meetings (and during the investigation of each of Plaintiff's

---

[25]   Plaintiff testified that he is familiar with the grievance process but that he never filed one. (Seigfried at 35, 46). He understood that he had the right to file a grievance. (Seigfried at 36, 46). He further never contacted his Business Agent directly either in person or by telephone regarding the allegations in the Complaint. (Fogarty at 45, 66-68).

complaints), no employee admitted to any of the alleged conduct. (Seigfried at 322; Bivinghouse at 55; Heath at 48, 51, 55, 56). There were never any witnesses either. (Seigfried at 285). In fact, any employee in the plant could have been engaging in the conduct about which Plaintiff had complained. (Seigfried at 130-131; Kett at 153; Heath at 48-49, 55, 56). Without any witnesses or proof, the Company was unable to discipline any particular employee.

Ultimately, and in response to the Plaintiff's final complaint of having anti-seize put on the door handle to his office, management immediately held a group meeting with all of the maintenance employees during which their jobs were threatened. (Kett at 110-11; Bivinghouse at 193; Heath at 108, 112). After the September, 2001 meeting with the Maintenance employees, the problems essentially stopped. (Seigfried at 235; Bivinghouse at 107, 109-110).

Really, the basis of Plaintiff's complaint is that he believed that the Company should have worked harder on his behalf. This belief is belied by the testimony of a number of individuals, including Plaintiff himself. (Seigfried at 326-37).[27] There simply is not much more the Company could have done in terms of addressing Plaintiff's complaints during the relevant time period.

Moreover, if Plaintiff was truly dissatisfied, he had the right report the incidents to another manager or even call the Company's corporate offices to complain about any alleged improper conduct. He did not. Indeed, even though he knew about another employee who had

---

[26]  The Union held meetings with the Maintenance employees as well in connection with the resolution of Plaintiff's complaints. (Fogarty at 50; Macri at 52-56, 61).

[27]  When asked what the Company should have done when - other than one (1) incident - there was never any proof or witnesses, Plaintiff said that Mr. Bivinghouse should have looked harder for a pattern and perhaps installed a camera. (Seigfried at 326-27). The Company researched into installing video cameras but had concerns about installation, cost and effectiveness. (Bivinghouse at 127-32). In addition, the Company would have had a legal obligation to bargain with the Union before installing a camera.

done so and was encouraged by other employees to do so, Plaintiff did not raise any complaints to any other manager or to the corporate headquarters.  (Siegfried at 137-39, 140-41).[28]

        As set forth above, the evidence conclusively establishes that each time Plaintiff complained, the Company took appropriate steps to identify the individual responsible and to address the situation.  On no occasion were Plaintiff's complaints ignored regardless of how petty they may have been.  Further, on no occasion was Plaintiff ever discouraged from approaching any member of management regarding his complaints of "harassment".  The conduct at issue here was in no way facilitated or condoned by the Company.  To the contrary, the Company did all that was in its powers to prevent and/or the situation.  Without proof of the individual(s) responsible, however, the Company could not fairly discipline any particular employee.  Even so, throughout 2001, the Company took pains to address Plaintiff's complaints in both individual and group settings.  The situation was effectively resolved in September, 2001 and Plaintiff has not complained since.  Because the evidence demonstrates that Defendant took prompt, appropriate actions reasonably calculated to end the "harassment", Defendant is entitled to summary judgment on this basis as well.

---

[28]   Plaintiff saw Mr. Macri frequently, sometimes once or twice a week and sometimes twice a day.  (Seigfried at 245).  Yet, Plaintiff testified that he never complained to him about the allegations in the Complaint or the Company's response thereto.  (Seigfried at 245; Macri 64-65).

**v.   CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that this Court grant summary judgment in favor of Defendant on Counts III and IV of Plaintiffs' Complaint under Fed. R. Civ. P. 56.

Respectfully submitted,

_____

Michael G. Tierce (Pa. I.D. No. 49896)
Lisa M. Scidurlo (Pa. I.D. No. 80487)

Attorneys for Defendant, Lehigh Valley Dairies, Inc.

Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103
(215) 575-0100

Dated:  July 21, 2002.

49

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LUTHER SEIGFRIED, JR.,           :
                                 :
          Plaintiff              :   CIVIL ACTION NO. 02-2951
                                 :
     v.                          :
                                 :   (JUDGE BAYLSON)
LEHIGH VALLEY DAIRIES, INC.,     :
                                 :
          Defendant              :

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON
ALL CLAIMS IN PLAINTIFF'S COMPLAINT**

---

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant,

Lehigh Valley Dairies, Inc., by and through its counsel, Stevens & Lee, moves this Court for

summary judgment against Plaintiff, Luther Seigfried, on all claims.

The grounds for Defendant's motion for summary judgment are fully set forth in

the accompanying memorandum of law.

Respectfully submitted,


_____
Michael G. Tierce (Pa. I.D. No. 49896)
Lisa M. Scidurlo (Pa. I.D. No. 80487)

Attorneys for Defendant

Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103

Dated:  July 21, 2003.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LUTHER SEIGFRIED, JR.,                  :
                                        :
            Plaintiff                   :    CIVIL ACTION NO. 02-2951
                                        :
    v.                                  :
                                        :    (JUDGE BAYLSON)
LEHIGH VALLEY DAIRIES, INC.,            :
                                        :
            Defendant                   :

---

**ORDER**

---

**AND NOW**, this _____ day of _____, 2003, upon consideration of

Defendant's Motion for Summary Judgment All Claims In Plaintiff's Complaint, and Plaintiff's

response thereto, it is hereby

**ORDERED** that Defendant's Motion is hereby **GRANTED** and Plaintiff's

Complaint is hereby **DISMISSED WITH PREJUDICE**.

_____
                                                    J.

## <u>CERTIFICATE OF SERVICE</u>

I, LISA M. SCIDURLO, hereby certify that on this 21st day of July, 2003 I

served a true and correct copy of the foregoing Defendant's Motion for Summary Judgment On

All Claims In Plaintiff's Complaint, a proposed form of Order, and Defendant's Memorandum of

Law in Support of Its Motion upon Plaintiffs' counsel *via* first-class mail, postage prepaid,

addressed as follows:

> Scott M. Pollins, Esquire
> 1620 Schoolhouse Lane
> Lower Gwyned, PA  19002


_____

Lisa M. Scidurlo