IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LUTHER SEIGFRIED, JR., : | |
| : | |
| Plaintiff : | CIVIL ACTION NO. 02-2951 |
| : | |
| v. : | |
| : | (JUDGE BAYLSON) |
| LEHIGH VALLEY DAIRIES, INC., : | |
| : | |
| Defendant : | |

_____

**DEFENDANT'S PRETRIAL MEMORANDUM**
_____

Pursuant this Court's Pretrial and Trial Procedures in Civil Cases and Federal Rule of Civil Procedure 16.1, Defendant, Lehigh Valley Dairies, Inc. ("Defendant" or "the Company" or "Lehigh") hereby submits its Pretrial Memorandum.

**I. Nature of the Case**

This is a case involving claims of "harassment" due to Plaintiff's alleged "disability," a 1987 work-related back injury. On May 17, 2002, Plaintiffs, Luther Seigfried, Jr. and Lois Seigfried ("Plaintiffs"), filed the above-captioned action against Lehigh, Mr. Seigfried's current employer, alleging, *inter alia*, that Lehigh violated the American with Disabilities Act of 1990 ("ADA") and the Pennsylvania Human Relations Act ("PHRA") during Mr. Seigfried's employment at Lehigh. Mr. Seigfried further asserted certain common law claims against Lehigh, both on his own behalf and on behalf of his wife.

On July 22, 2002, Defendant moved to dismiss Counts III and IV of Plaintiff's Complaint, which asserted common law claims for Negligent Failure to Prevent a Foreseeable Harm

1

and Loss of Consortium. On September 11, 2002, the Court granted Defendant's motion and dismissed Counts II and IV of Plaintiff's Complaint with prejudice. On July 21, 2003, Lehigh moved for summary judgment on Plaintiff's remaining two (2) claims. That Motion is pending.

## II. Facts

### A. Plaintiff's Employment at Lehigh.

Plaintiff has been continuously employed by Lehigh since 1979. While Plaintiff was and continues to be an employee of Lehigh, he was and continues to be a member of a bargaining unit covered by a collective bargaining agreement between Lehigh and the International Brotherhood of Teamsters Union Local No. 463 ("Local 463") with whom Lehigh has had a longstanding collective bargaining relationship. The terms and conditions of his employment, including discharge and discipline, are governed principally by the terms of the labor contract.

Plaintiff's own admissions establish that the Company consistently has treated him favorably, perhaps more favorably than any other employee in the Company's history. Specifically, in 1979, the Company hired Plaintiff to work in the Cooler Department at Lehigh's Lansdale, Pennsylvania facility. He suffered a work related back injury in 1987. He went on a workers' compensation leave of absence until September, 1988. At that time, Plaintiff returned to work as a "Clerk" in the Maintenance Department, a position <u>that the Company created for him</u>. The Company had no obligation, contractual or otherwise, to create this job.

In approximately 1990, Plaintiff took over the "relief" responsibility at the Company's Water Treatment Plant. This hybrid job too was created by the Company for Plaintiff. Plaintiff was satisfied with the change in his job duties. From 1990 through mid-2001, Plaintiff worked at the Treatment Plant on a relief basis.

SL1 369702v1/24659.004

Plaintiff ultimately was relieved of his Treatment Plant responsibilities in May, 2001. Relief of the Treatment Plant responsibilities can best be characterized as a favorable change to Plaintiff because it was the only physical work that Plaintiff was required to perform. Plaintiff had a number of discussions with members of management regarding his new responsibilities. In fact, Plaintiff submitted a list of "demands" for his new job. The Company created a job consistent with Plaintiff's extensive "demands." He was satisfied with the change in his job duties as of May, 2001, and remains satisfied with his job as it exists today.

### B.  Plaintiff's Medical Restrictions From 1990-2001.

Plaintiff's work-related medical restrictions from the time he returned to work in 1990 to 2001 are relatively unremarkable. Indeed, the Physical Capabilities Checklist submitted by Dr. Richard R. Ruth in 1990 establishes that Plaintiff's physical limitations were and still are extremely limited. For example, the doctor indicated that Plaintiff can stand one to four hours per day; sit five to eight hours per day; walk one to three hours per day; drive five to eight hours per day; and use his hands for repetitive motion such as simple grafting, pushing and pulling, and fine manipulation. Dr. Ruth also indicated that Plaintiff can use his feet for repetitive movement and could occasionally bend, squat, and climb. Finally, Dr. Ruth indicated that Plaintiff could lift up to 50 pounds maximum to below his shoulder.

On April 27, 1993, Dr. Ruth submitted a note, stating that Plaintiff is still under his original restrictions; "that is, limited lifting and stooping; limited driving time for delivery - 60 miles per day limit; a 40-hour work week, and eight-hour days and two consecutive days off (*i.e.,* Saturday and Sunday, or Sunday and Monday), getting help for lifting, if necessary."

3

On August 16, 1996, Plaintiff exacerbated his back injury and was under Dr. Ruth's care from August 17, 1996 through August 27, 1996. Dr. Ruth submitted a note indicating that Plaintiff "may need help lifting as yet." There were no other restrictions set forth in the doctor's note. Finally, in connection with the negotiation of Plaintiff's new job in May, 2001 (relief of Treatment Plant responsibilities), Dr. Ruth submitted a note stating that Plaintiff was still under his original restrictions, which include assistance with lifting and restriction on bending. He further indicated that Plaintiff was able to work overtime. Since May, 2001, Plaintiff's work-related medical restrictions have not been modified.

### C. The Company's Non-Harassment Policy

There is no dispute that since at least 2000, the Company has had a "zero tolerance" policy in place that prohibits harassment of any kind. Plaintiff first was provided with a copy of the policy in December, 2000. He acknowledged that he read and understood the policy. The Company (*via* Plaintiff) posted an abbreviated version of the Non-Harassment policy on all of the Company's bulletin boards in 2000. The policy remains posted to date. In 2000 or 2001, Plaintiff also attended one or more classes where management explained the terms of the policy and the reporting procedure to all Lehigh employees. There can be no question that Plaintiff was aware of the policy and understood its terms.

### D. Plaintiff's Complaints of "Harassment"

By Plaintiff's own admission, Plaintiff's complaints of harassment are essentially limited to the time period of January, 2001 and September, 2001. A close look at Plaintiff's allegations demonstrate the pettiness of most, if not all, of his complaints. Even so, each time Plaintiff complained,

management investigated his allegations and took prompt, appropriate action. The following summarizes Plaintiff's account of the chronology of events:

In early February, 2001, Plaintiff complained that Jim Heath, his Manager, changed his start time; his clipboard was looked through; his lunch kettle was disturbed; he was told by a third party that other employees looked under the hood of his truck; and, that someone clipped a job advertisement to his time card. A meeting was held with Diane Kett, Manager of Human Resources, Ron Bivinghouse, Environmental Safety and Security Manager, Mr. Heath, Plaintiff and his Shop Steward, Norm Green, to address his complaints. Upon investigation, it was determined that Mr. Heath had already explained to Plaintiff, in writing, that his start time was being changed due to legitimate business reasons. Moreover, it was determined that Plaintiff's lunch kettle was not damaged nor was his truck. In any event, after that initial meeting, Mr. Heath held a series of meetings with the Maintenance employees. At the meetings, Mr. Heath told the Maintenance employees that they would be terminated if the Company determined that any one of them had engaged in inappropriate conduct related to Mr. Seigfried's complaints. No employee admitted to engaging in the conduct or offered any information as to who may have engaged in the conduct about which Plaintiff complained. In fact, most, if not all, of Plaintiff's allegations have not been corroborated by any witnesses.

The next time Plaintiff alleges that he was "harassed" was on March 18, 2001, over one (1) month later, when his co-worker requested grievance forms from the Maintenance Department Shop Steward because a "light duty person [was] working six days." Plaintiff assumed that this request was related to him. However, it is not against Company policy to request grievance forms, so no employee was disciplined as a result of this complaint.

5

On April 5, 2001, Plaintiff claims he found a "high-lighted" memo attached to his time card related to work-related injuries Plaintiff had posted the unaltered "Work-Related Injuries" memorandum on all Company bulletin boards. He claims that the memo attached to his time card high-lighted the section regarding the "temporary" nature of the modified duty program (of which Plaintiff is not even a part). There were no witnesses to this incident. The Company conducted an investigation regarding who may have placed the posting on Plaintiff's time card. With no witnesses and no corroborating evidence, the Company did not discipline any employee for this "incident."

The next incident about which Plaintiff complained occurred on April 19, 2001 when he claims that he found a forged work order on his time card. No one was present with him when he found the work order. He brought the work order to the attention of Mr. Bivinghouse.

This is the only occasion when the Company was able to conclusively identify the individual responsible for the conduct about which Plaintiff complained. In response to Plaintiff's complaint, the Company investigated the incident and Mr. Bivinghouse confronted the Union employee he believed forged the work order. The employee, Eric Rohrbach, admitted to forging Mr. Heath's initials on the work order. He received a written warning pursuant to the terms of the labor contract. In his over 25 years with the Company, Mr. Rohrbach had never been disciplined. Moreover, Mr. Rohrbach has never been accused of engaging in similar conduct since that time.

Approximately one (1) month later, Plaintiff claims that someone copied and "posted" information relating to his back injury and the negotiation of his new job (relieving him of his Treatment Plant responsibilities) and left the copies around the plant. Once again, there were no witnesses. Plaintiff reported the incident to Diane Kett. Again, an investigation took place, including interviews of a number of employees, and the Company was unable to identify who was responsible for the incident.

6

Plaintiff claimed that on May 23, 2001 some one placed an article "Power to the Working Man" around the plant. He brought it to the attention of Mr. Bivinghouse. Mr. Bivinghouse investigated the incident. Again, there were no witnesses and the Company was unable to obtain any proof of who was responsible.

Between January and September, 2001, on occasion, Plaintiff complained about other minor issues, all of which were immediately addressed. For example, the vacation schedule and regular schedule are behind locked glass as a result of Plaintiff's complaints of tampering. Plaintiff claimed that someone urinated in his hard hat and on his office chair. There were no witnesses. He received a new hard hat and a new chair. Finally, Plaintiff complained that an employee cut an extension cord to the air conditioner in his office shortly after it was built for him and also disturbed papers in his office. Again, there were no witnesses to any of these allegations and Plaintiff admits that none of his personal property was ever damaged or stolen.

After a full investigation into all of these incidents during the course of nine (9) months in 2001, the Company was unable to identify the individual(s) responsible for the alleged conduct. Even so, management held a number of meetings with the Maintenance employees stressing the Company's zero tolerance for "harassment" and insisting that the joking around and horseplay stop immediately. During each investigation, as well as during each of the meetings, no employee admitted to any of the alleged conduct. There were never any witnesses either. In fact, any employee in the plant could have been engaging in the conduct about which Plaintiff had complained  Without any witnesses or proof, the Company was unable to discipline any particular employee for the alleged misconduct.

E.   **The September 25, 2001 Meeting with the Maintenance Employees.**

SL1 369702v1/24659.004

Three (3) months had passed without any major incidents. The final incident occurred in September, 2001 when someone had placed anti-seize on Plaintiff's office door handle. Plaintiff cleaned it off and complained to Ms. Kett. As a result of this complaint, management immediately held a group meeting with all of the Maintenance employees. Even though there was no proof that the Maintenance employees were responsible for the "anti-seize" incident, to send yet another message, the Company issued all of the employees a verbal warning. After this meeting, Ms. Kett, Mr. Bivinghouse, and Larry Cuomo, Regional Director of Safety, met with Plaintiff to communicate to him what had occurred. Since the meeting in September, 2001, there have been no other reports of "harassment" by Plaintiff.

### III. Monetary Damages Claimed by Plaintiff

Plaintiff claims as his damages compensatory and punitive damages, attorney's fees and costs, and "reimbursement of any expenses and financial losses Seigfried may have incurred". Defendant maintains that Plaintiff is not entitled to any damages whatsoever.

### IV. Witnesses Defendant May Present at Trial

**Diane Kett**
**Manager of Human Resources**
Lehigh Valley Dairies, Inc
880 Allentown Road
Lansdale, PA 19446

**Ronald Bivinghouse**
**Manager of Environmental Safety and Security**
Lehigh Valley Dairies, Inc
880 Allentown Road
Lansdale, PA 19446

**James Macri**
**Vice President of Operations**
Lehigh Valley Dairies, Inc
880 Allentown Road

SL1 369702v1/24659.004

        Lansdale, PA 19446

        **James Heath**
        **Maintenance Manager**
        Lehigh Valley Dairies, Inc
        880 Allentown Road
        Lansdale, PA 19446

The subjects of information include Plaintiff's work history and employment with Lehigh; the actions taken by Defendant with respect to the terms and conditions of Plaintiff's employment, including his favorable treatment; the circumstances pertaining to Plaintiff's complaints of alleged harassment, as well as the extensive efforts undertaken by Defendant to address those complaints to Plaintiff's satisfaction; and, the absence of any unlawful treatment of or unlawful decision involving Plaintiff in connection with the allegations in the Complaint, including Plaintiff's claims for damages.

        **Ronald Mark Krasnick, M.D.**
        Orthopedic Consultant
        Penn Diagnostic Center
        1801 Market Street
        Philadelphia, PA 19103

Dr. Krasnick is Defendant's medical expert in this case. He will testify regarding the conclusions he reached in connection with his assessment of Plaintiff's alleged disability.

Defendant respectfully reserves the right to change the order of the witnesses listed above at trial, and reserves the right to call any witnesses listed on Plaintiff's Pretrial Memorandum. Further, Defendant reserves the right to supplement this list if and when the Court deems appropriate.

**V.  Legal Issues**

Defendant contends that the legal issues in this case, as fully briefed in Defendant's Memorandum of law in support of its Motion for Summary Judgment, are as follows:

1.      Whether Plaintiff is "disabled" as a matter of law under the ADA;

SL1 369702v1/24659.004

2. Assuming without admitting that Plaintiff is "disabled" as a matter of law, whether Plaintiff can prove that any alleged "harassment" was due to his alleged disability;

3. Assuming without admitting that Plaintiff is "disabled" and can prove that any alleged harassment was due to his "disability", whether Plaintiff can prove that any alleged harassment is "severe and pervasive" as a matter of law; and,

4. Assuming without that Plaintiff could prove actionable harassment, whether Defendant took action that was reasonably calculated to end any alleged harassment, and ultimately took adequate remedial measures as a matter of law under the affirmative defense established by *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v.City of Boca Raton*, 524 U.S. 775, 807 (1998).

**VI. <u>Scheduled Exhibits to be Offered at Trial</u>**

Defendant's proposed Schedule of Exhibits is attached as Exhibit A.  Defendant respectfully reserves the right to use as Exhibits at trial any Exhibits identified by Plaintiff in his Pretrial Memorandum. Further, Defendant reserves the right to supplement this list if and when the Court deems appropriate.

Respectfully submitted,

_____
Michael G. Tierce (Pa. I.D. No. 49896)
Lisa M. Scidurlo (Pa. I.D. No. 80487)
Attorneys for Defendant

Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103

Date:  August 4, 2003

## **CERTIFICATE OF SERVICE**

I, Lisa M. Scidurlo, hereby certify that on this 4th day of August, 2003, a true and correct copy of Defendant's Pretrial Memorandum was served upon Plaintiff's counsel via U.S. mail, postage prepaid, addressed as follows:

>Scott M. Pollins, Esquire
>1620 Schoolhouse Lane
>Lower Gwyned, PA  19002


_____
Lisa M. Scidurlo

SL1 369702v1/24659.004

12

SL1 369702v1/24659.004