**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LUTHER B. SIEGFRIED, JR. | : | CIVIL ACTION NO. 02-CV-2951 |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| LEHIGH VALLEY DAIRIES, INC. | : | (JUDGE MICHAEL M. BAYLSON) |
| Defendant | | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL
CLAIMS IN PLAINTIFF'S COMPLAINT**

Pursuant to F.R.Civ.P. 56 and Local Civil Rule 7.1, Plaintiff, Luther B. Siegfried, Jr. ("Siegfried"), by his attorney, Scott M. Pollins, Esquire, submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on All of Plaintiff's Claims.

**I.      INTRODUCTION and PROCEDURAL HISTORY**

In February 1987, Siegfried sustained a severe back injury and he has been disabled since that time. Beginning in approximately January 2001 and continuing through September 2001, Siegfried was subjected to constant, severe and pervasive harassment based on his disability by other LVD employees. Siegfried filed a complaint with the Pennsylvania Human Relations Commission in June 2001, amended that complaint in July 2001 and LVD was served with the complaint in August 2001.

On May 17, 2002, Siegfried and his wife, Lois Siegfried, commenced this action against LVD alleging 1) that LVD violated the Americans with Disabilities Act of 1990 ("ADA") and the Pennsylvania Human Relations Act ("PHRA") by failing to exercise reasonable care to prevent and correct promptly illegal disability-based harassment,

2) that LVD was negligent for failing to prevent the foreseeable harm that the repeated, severe and pervasive disability-based harassment caused Siegfried and 3) that LVD was responsible for Mrs. Siegfried's loss of consortium.  On September 10, 2002, the Court dismissed Siegfried's negligence claim and his wife's loss of consortium claim.  LVD has filed a Motion for Summary Judgment seeking dismissal of Siegfried's claims for disability harassment under the ADA and PHRA.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS [1]

### A.    Siegfried's Employment at LVD: 1979-1987

Siegfried began working for LVD in 1979.  **See** Siegfried's deposition transcript at 8 attached as Exhibit 1.  Siegfried's first job at LVD was in "empty case" in the cooler department.  **Id.** at 13-14.  In that position, Siegfried pulled empty cases off of trailers. **Id.** at 14.  Siegfried next worked as a store pick putting together orders for particular stores.  **Id.** at 15.  After store pick, Siegfried worked as a load checker loading trailers and checking that trailers were loaded with the correct number of cases.  **Id.** at 16-17.

### B.    Siegfried's Back Injury and Employment at LVD from 1987-2001

On February 9, 1987, while Siegfried was picking up a case of milk, he felt severe pain hit his lower right back.  **See** Exhibit 1 at 17 and Lehigh Valley Dairies, Inc. Work Injury Report attached as Exhibit 2.  Richard R. Ruth, D.O. is Siegfried's treating doctor. According to Dr. Ruth's January 6, 1988 letter to LVD, Mr. Siegfried was initially diagnosed with acute traumatic inguinal neuritis.  **See** Dr. Ruth's January 6, 1998 letter attached as Exhibit 3.  Dr. Ruth stated that because anytime Siegfried got into a lifting

---

[1] Plaintiff's Statement of Undisputed Material Facts differs from that of Defendant's as Plaintiff and Defendant have not yet agreed on a Dual Statement of Undisputed Material Facts.

position with his arms stretched out that Dr. Ruth would assume that Siegfried was unable to return to his former job.  **Id.**

Siegfried continued to be unable to return to work as a result of his back injury. On June 28, 1988, Bill Peifer (LVD's Director of Operations at the time) wrote a memo to Harold Masteller regarding Siegfried's work situation.  **See** June 28, 1988 memo attached as Exhibit 4.  In that memo, Peifer stated that he could not identify any existing job classifications or light duty jobs compatible with Siegfried's medical restrictions.  **Id.** Peifer suggested that a new job classification such as a maintenance clerk could be created for Siegfried so that he could return to work in a productive light duty position. **Id.**

Shortly thereafter Central Rehabilitation Associates, Inc. submitted a proposed job analysis for Siegfried with a job title of maintenance clerk.  **See** July 22, 1988 Job Analysis attached as Exhibit 5.  After over 1 ½ years of being out of work, Siegfried returned to work on September 21, 1988 in the maintenance clerk position.  **See** September 28, 1988 memo from Pat McGowan to Claire Minardo attached as Exhibit 6. As the maintenance clerk, Siegfried wrote up work orders for the maintenance department and garage, took care of DOT slips, prepared safety reports and handled the emergency lights, fire extinguishers and first aid kits.  **See** Exhibit 1 at 19.  On April 26, 1990, Siegfried's doctor wrote a letter stating that Siegfried continues to experience constant and at times severe back pain.  **See** Dr. Ruth's April 26, 1990 letter attached as Exhibit 7.

In approximately 1990 or 1991, Siegfried's position was modified to include duties at the waste treatment plant.  **See** Exhibit 1 at 22-23 and November 9, 1990 Waste

Treatment Operator Job Description attached as Exhibit 8. Siegfried does not recall his supervisor Jim Heath (Maintenance Manager) ever stating that he got the golf cart for Siegfried. **See** Exhibit 1 at 189-190. Siegfried's co-worker Glenn Kibblehouse also used the golf cart. **Id.** at 190. Heath testified that because Siegfried was not physically capable of doing the job himself, he went out and bought a golf cart for $350. **See** Jim Heath's deposition transcript at 87-89 attached as Exhibit 9. Glenn (Kibblehouse) currently uses the golf cart at the treatment plant. **Id.** at 90.

On April 27, 1993 Dr. Ruth wrote to LVD stating that Siegfried continued to suffer from back and leg pain, which was severe at times and that he should have limited lifting and stooping. **See** Dr. Ruth's April 27, 1993 letter attached as Exhibit 10. On June 6, 1995, Dr. Ruth wrote to LVD stating that Siegfried's medical condition and restrictions were essentially identical to what they were two years before. **See** Dr. Ruth's June 6, 1995 letter attached as Exhibit 11. On July 26, 1995, John J. Bowden, Jr., D.O. submitted a review of Dr. Ruth's treatment of Siegfried and concluded that in his professional medical opinion, the initial evaluation and subsequent treatments were reasonable and necessary. **See** July 26, 1995 records review prepared by Dr. Bowden attached as Exhibit 12.

**C.      Siegfried's impairments from 2001 - 2003**

On May 1, 2001, Dr. Ruth wrote a letter to LVD stating that Siegfried was still under the original restrictions, he still experiences back and leg pain which at times is severe and he should have very little lifting and bending. **See** Dr. Ruth's May 1, 2001 letter attached as Exhibit 13. In Dr. Ruth's February 2003 expert report, he states that Siegfried continues to experience a great deal of pain whenever he does anything

4

physical.  **See** Dr. Ruth's February 25, 2003 expert report attached as Exhibit 14.  Dr.

Ruth describes that Siegfried cannot stand for more than a few minutes at a time because

he experiences back and leg pain.  **Id.**  Siegfried must always be mindful of what he does

and how he does it so that he does not precipitate a debilitating episode of sharp pain.  **Id.**

      Siegfried does not take baths because he has a hard time getting out of the tub.

**See** Exhibit 1 at 96-97.  He cannot was his back or dry his back.  **Id.** at 339.  He has no

tie shoes because he cannot bend down to tie them.  **Id.** at 97.  He has trouble brushing

his teeth because of when he leans forward to spit.  **Id.**  He has trouble sitting all the time.

**Id.** at 97-98.  He cannot work around the house, and he gave up gardening.  **Id.** at 98.  He

has trouble anytime he bends forward.  **Id.** at 340.  He cannot run.  **Id.** at 341.  He used to

go square dancing 4-5 nights a week.  **Id.** at 346.  He has not gone dancing for a while

and when he does go, it is usually once a week and at older clubs that do slow dance.  **Id.**

at 347.  Siegfried took three brothers through little league hardball and three daughters

through softball, however when his son came along he could not play any sports with

him.  **Id.** at 349-350.

      **D.**     **LVD's Harassment Policy and Who is Responsible to Investigate
Harassment Complaints**

      In December 2000 James Macri (LVD's Vice President of Operations) issued a

notice to all employees regarding the company's harassment policy.  **See** December 19,

2000 Notice from Jim Macri to All Employees attached as Exhibit 15.  Macri issued that

notice as a result of him being informed by Ronald Bivighouse (LVD's Environmental

Safety and Security Manager) and probably Diane Kett (LVD's Human Resources

Manager) of complaints of harassment by several maintenance department employees,

including Siegfried.  **See** James Macri deposition transcript at 45-46 attached as Exhibit

16.

      LVD's harassment policy is contained in the Suiza Foods Corp. Code of Business

Conduct.  **See** Diane Kett deposition transcript at 64 attached as Exhibit 17 and Code of

Business Conduct attached as Exhibit 18.  The harassment policy states:

> Our policy is to provide a work environment that is pleasant, professional, and free from
> intimidation, hostility or other offenses which might interfere with work performance.
> We will not tolerate harassment of any sort – verbal, physical or visual – particularly
> against employees in protected classes.  These classes include, but are not necessarily
> limited to, race, color, religion, sex, age, sexual orientation, national origin or ancestry,
> disability, medical condition, marital status, veteran status, or any other status protected
> by law and not listed here.
>
> Workplace harassment can take many forms.  It may be, but is not limited to, words,
> signs, offensive jokes, cartoons, pictures, posters, e-mail jokes or statements, unwelcome
> invitations, pranks, intimidation, physical assaults or contact, or violence.  Other
> prohibited conduct includes producing or distributing written or printed material of a
> harassing or offensive nature (including notes, photographs, cartoons or articles) and
> taking retaliatory action against an employee for discussing of making a harassment
> complaint.  (p. 15).

………………………….

> If you are harassed, we encourage you to complain directly to the alleged harasser, and
> make it clear that the harasser's behavior is unacceptable, unwelcome and offensive and
> must stop immediately.  However, it is not required that you do so.  It **is** essential that you
> report the harassment to your supervisor, your local human resources manager, our Ethics
> Compliance Officer or our General Counsel according to the procedures set forth on page
> 21 of this Code of Business Conduct.  (p. 17).

………………………….

> Reporting known or suspected violations of our Code of Business Conduct is a sensitive
> issue.  However, you  must recognize that violations could have a profoundly adverse
> effect on our investors, our customers, our consumers and on the livelihoods of all of us.
> Therefore, you must promptly report all questionable conduct or violations (or suspected
> violations) of this Code of Business Conduct.  No disciplinary or other retaliatory actions
> will be taken against any person as a result of reporting any suspected violation.
>
> The first and preferred option for reporting violations of this Code of Business Conduct is
> for you to talk to your immediate supervisor or your local human resources manager.  If
> you do not feel comfortable discussing the matter on a local level, you should call our
> Ethics Compliance Officer (800-431-9214), or our General Counsel (800-431-9214).
> If an employee reports a known or suspected violation of this Code of Business Conduct
> to you as a supervisor or manager, you must immediately pass that report along to our
> Ethics Compliance Officer (800-431-9214) who will investigate the report.  (p. 21-22).

LVD also has its own safety rules, which state that "[h]orseplay and practical jokes can harm employees. They have no place at work. Anyone involved in these practices will be subject to DISCPLINE OR DISCHARGE." **See** Lehigh Valley Dairies, Inc. Safety Rules attached as Exhibit 19.

Diane Kett has been LVD's Human Resources Manager since May 2000. **See** Exhibit 17 at 31-32. Kett never failed to document in writing any meeting she had with anyone regarding the issue of harassment. **Id.** at 17. In her job as HR Manager, Kett has very minimal contact with the union. **Id.** at 53. She believes that the union contract contains a provision regarding discrimination or harassment. **Id.** at 64-65. However, she cannot recall if that provision contains a prohibition on disability harassment. **Id.** at 65-66. Kett testified that Bivighouse is the primary and in fact the only person at LVD who investigates employee complaints of harassment. **Id.** at 79. Kett has no idea if Bivighouse has a job description. **Id.**

Bivighouse has been LVD's Environmental Safety and Security Manager since 1996. **See** Ronald Bivighouse deposition transcript at 21 attached as Exhibit 20. Prior to that position, he was an employee in the maintenance department from 1956-1979 and the maintenance manager from 1979-1990. **Id.** at 17-22 and Bivighouse Errata Sheet attached as Exhibit 21. Bivighouse has no training in human resources. **Id.** at 46-47. Bivighouse assists Kett in investigating harassment complaints when Kett is too busy or she just does not want to get involved. **Id.** at 47-48.

Kett testified that she received a written format to follow in the event of an employee harassment complaint. **See** Exhibit 17 at 98-99 and General Interview Form attached as Exhibit 22. She cannot recall when she received that form, but she believes

that it was after Siegfried's first harassment complaint. **Id.** at 99. She then stated that she

thought she received this form after Siegfried filed his PHRC complaint. **Id.** at 100.

At her deposition, Kett was showed a series of similar harassment investigation

forms. For each form, Kett testified she recognized the form, however she never actually

filled out any of the forms. **Id.** at 101-104. The forms included a Complainant Interview

Form (attached as Exhibit 23), Alleged Harasser Pre-Interview Considerations (attached

as Exhibit 24), Alleged Harasser Interview Form (attached as Exhibit 25) and Co-

Employee Interview Form (attached as Exhibit 26). Bivighouse testified that he had

never seen any of these forms before reviewing Kett's deposition transcript. **See** Exhibit

20 at 145-147.

Kett testified that she could not even remember the year that Siegfried first

complained about harassment. **See** Exhibit 17 at 105.

Prior to becoming the maintenance manager, Heath worked as a maintenance

mechanic for 11 years and as the maintenance supervisor for several years. **See** Exhibit 9

at 12, 20-21. All of the current maintenance department employees worked for Heath

when he was the maintenance supervisor under Bivighouse. **Id.** at 23. In response to the

question of what training he has had in investigating workplace harassment complaints,

Heath testified "[a]ctual training on investigation, none." **Id.** at 34-35. He has received

training on what harassment in the workplace is. **Id.** at 35-36.

### E.    Siegfried's Complaints of Disability Harassment from January 2001 – September 2001 and LVD's Response to Those Complaints

During the period of January 2001 – September 2001, Siegfried complained of

repeated instances of severe and pervasive disability harassment. Notwithstanding any

alleged response by LVD to his complaints, Siegfried testified that he was aware of only

one meeting that occurred in response to his harassment complaints, and that meeting occurred in approximately August or September 2001.  **See** Exhibit 1 at 236-237. Siegfried complained to Kett and Bivighouse about the harassment.  **Id.** at 109-110.  On more than one occasion Bivighouse instructed Siegfried to investigate his complaints himself.  **Id.** at 332-334.

During the period of January 2001 – September 2001, all non-management maintenance department employees were members of Teamsters Local Union 463. Siegfried did not file any grievances regarding his harassment complaints because in his prior dealings with the union they had not helped him.  **See** Exhibit 1 at 46.  Additionally, he was told that the union frowns upon filing grievances.  **Id.** at 36 and 252. Furthermore, Siegfried's co-worker, Fran Hendricks, a union shop steward himself, testified that Siegfried would not stand a chance in filing a grievance because he would have to go against Rohrbach, the maintenance department shop steward.  **See** Fran Hendricks deposition transcript at 81 attached as Exhibit 27.  Hendricks has worked as a freight receiver at LVD for 28 years.  **Id.** at 9.

Siegfried rarely complained to Heath because he had heard from several other maintenance department employees that when other people went to Heath to complain about anything, nothing really got done.  **See** Exhibit 1 at 110-111.  Heath testified that he has talked to the maintenance employees about Siegfried's harassment complaints, however with the department being a union shop, "[n]obody knows nothing.  Nobody's seen nothing.  Nobody hears nothing.  They all kind of stick together as a group as far as the union goes."  **See** Exhibit 9 at 30-31.  Heath believes the maintenance department is this way because they have a very strong union.  **Id.** at 31.  An example of a strong union

is where an employee complains about harassment, several other employees in the department know who did the harassment and they do not say anything when asked by a manager.  **Id.** at 39.

In January 2001, several of Siegfried's union co-workers in the maintenance department filed a grievance to revoke his seniority and regarding his vacation picks.  **See** Exhibit 1 at 38-39 and 235-236.  The result of this grievance was that Siegfried's seniority would stand.  **See** Exhibit 1 at 39-40.

At around the same time in January 2001, Heath wrote a note to Siegfried that he wanted Siegfried to change his start time to 7:30 a.m. until further notice.  **See** Jim (Heath) note to Lou (Siegfried) attached as Exhibit 28.  Siegfried believes that Heath's decision to change his start time was related to his back injury because his co-workers were trying to get him out of that department and trying to antagonize him enough to quit.  **See** Exhibit 1 at 124-125.  Heath's alleged reason for changing Siegfried's start time was because Glenn Kibblehouse needed more coverage at the treatment plant.  **Id.** at 121-122.  Heath claimed that Kibblehouse was working overtime and Siegfried was supposed to be his relief person.  **See** Exhibit 9 at 106-107.

On February 2, 2001 a meeting was held with Siegfried, Kett, Bivighouse, Heath and Norman Greene (union shop steward).  The meeting was held as a result of Siegfried's recent complaints that his start time was changed again, his clip board was looked through, other employees had opened the hood of his truck and a job ad was clipped to his time card.  **See** Diane Kett's February 2, 2001 notes of that meeting attached as Exhibit 29 and Ronald Bivighouse's notes of that meeting attached as Exhibit

30. The result of that meeting was supposed to be a meeting with all maintenance employees in which they could discuss their feelings and air their grievances. **Id.**

Heath subsequently had a meeting with the day shift maintenance employees in which he stated that any harassment had to immediately cease. **See** Exhibit 9 at 44-45. The day shift employees included Glenn Kibblehouse and Eric Rohrbach. **Id.** at 45. He did not document that he had actually had this meeting. **Id.** at 46. He asked the first shift maintenance employees if they knew who has responsible for Siegfried's harassment complaints and they responded by stating that the maintenance department is in the middle of the plant and it could have been anyone. **Id.** at 48. Heath told the first shift employees that if they were found to have committed any act of harassment, they would be immediately terminated whether they had 40 years or 4 years with the company. **Id.** at 51. Heath had the union's support for that statement. **Id.** at 52.

Within the same week, he had a similar meeting with the second shift maintenance employees. **Id.** at 47. When he asked the second shift employees the same question, they responded by stating nothing. **Id.** at 51. Heath also had a meeting with the third shift employees. **Id.** at 53. He gave the third shift the same warning regarding automatic immediate termination. **Id.** at 55. When asked if they knew anything about Siegfried's complaints, the third shift employees simply stated that anyone could have done the harassment. **Id.** at 55-56. Heath claims he held another round of three meetings with the maintenance department employees a couple months later. **Id.** at 58-59.

On March 18, 2001, Siegfried found a note at the maintenance department time clock from Eric (Rohrbach) to Ralph (Schmell). **See** note attached as Exhibit 31. Eric Rohrbach is a maintenance department co-worker of Siegfried's and Ralph Schmell was a

11

maintenance department union shop steward at that time.  In the note, Rohrbach

requested grievance forms for a lite (sic.) duty person working six days.  **See** Exhibit 31.

Siegfried believes that the note was directed at him because he was the only light duty

person working that weekend.  **See** Exhibit 1 at 166-167.  Siegfried gave a copy of this

note to Kett.  **See** Exhibit 17 at 142.  Kett did not respond to this issue because she did

not understand what it was about and she thinks Bivighouse might have looked into it.

**Id.** at 143.

On April 5, 2001, Siegfried found a highlighted memo regarding work-related

injuries on his time card.  **See** Exhibit 1 at 168-169 and April 3, 2001 memo from Human

Resources Dept. to All Employees attached as Exhibit 32.  The highlighted portion of the

memo stated:

> Any employee assigned to the Modified Duty Program is done so on a
> temporary basis until he/she is physically capable of being reassigned to
> his/her permanent job….  Violations of any … discharge of employee.

Siegfried believes that this note was placed on his time card because he is on light duty.

**See** Exhibit 1 at 170.  Siegfried gave a copy of this memo to Kett and told her he found

the note on his time card.  **See** Exhibit 17 at 143-44.  Kett cannot recall what was done in

response to this complaint, and she thinks Bivighouse looked into this.  **Id.** at 144-45.

Bivighouse could not recall if he had seen that document in his file or in Kett's file that

he reviewed prior to his deposition.  **See** Exhibit 20 at 163.

On April 10, 2001, Siegfried discovered that someone had urinated in his one of

poly buckets.  **See** Siegfried's daily log for April 10, 2001 attached as Exhibit 33.

Siegfried kept daily logs of any incidents of harassment.  **See** Exhibit 1 at 376-378.

Siegfried told Mickey Qawasmy (Jim Macri's assistant at the time, currently LVD's MIS Coordinator) and Pat Pawlak (Diane Kett's assistant).  **Id.**

On April 19, 2001, Siegfried found a note attached to his time card which was supposedly from Heath to Siegfried directing him to handle a work order.  **See** Exhibit 1 at 172 and the above note attached as Exhibit 34.  Siegfried gave this document to either Bivighouse or Kett and he is certain that Bivighouse ended up with it.  **Id.** at 174.  Kett had no involvement investigating this incident.  **See** Exhibit 17 at 146.  Bivighouse reviewed the document and determined that Eric Rohrbach had forged Heath's initials.  **See** Exhibit 20 at 166.  Bivighouse told Siegfried that if Rohrbach admitted to writing the note he would get 3 days off.  **See** Exhibit 1 at 175.  Bivighouse also told Siegfried that if Rohrbach did not admit to writing the note, they would get a handwriting expert and if the results came back that Rohrbach forged the note he would be fired.  **Id.**

Bivighouse called Rohrbach into his office, told him that this was a very serious offense by changing a work order and forging a manager's initials.  **See** Exhibit 20 at 166.  Bivighouse did not ask Rorhbach if he actually forged the note, but instead gave him some time to think about it and stop back and see him once he had thought about it.  **Id.**  At first, Rohrbach denied it was his handwriting.  **See** Exhibit 17 at 129.  Rohrbach came back about an hour later and admitted to changing and forging the note.  **See** Exhibit 20 at 166.  Contrary to what he had told Siegfried and contrary to what Heath had previously told the maintenance department several months prior regarding discipline for harassment, Bivighouse simply issued Rohrbach a written warning.  **See** April 19, 2001 written warning from Bivighouse to Rohrbach attached as Exhibit 35.  In LVD's brief, they claim that Rohrbach had never been previously disciplined in his entire 25 year

tenure with the company.  **See** Defendant's Memorandum of Law at 12.  However, Rohrbach was previously disciplined by Bivighouse in June of 1989 and he had received a department wide discipline in August 1983.  **See** June 26, 1989 letter of warning from Bivighouse to Rohrbach and August 31, 1983 disciplinary action from Bill Peifer jointly attached as Exhibit 36.

At around this time, Siegfried became aware that his maintenance department co-workers had filed a grievance to have light duty employees separate from the maintenance department union workers.  **See** Exhibit 1 at 315-316.  Heath understood the basis of the grievance to be that the union workers in the maintenance department felt the Siegfried was doing a union job and that his job should be done by a capable person instead of a light duty person.  **See** Exhibit 9 at 86.  Bivighouse believes that Glenn Kibblehouse filed the grievance.  **See** Exhibit 20 at 51.  Kibblehouse's grievance against Siegfried started the process of Siegfried being removed from the treatment plant.  **Id.** at 53.  Bivighouse understood that the grievance was resolved by Macri and Heath removing Siegfried from the treatment plant.  **Id.**

In May 2001, Siegfried was removed from the treatment plant and Bivighouse issued him guidelines for his light duty job.  **See** May 10, 2001 Guidelines for Light Duty Memo attached as Exhibit 37.  Although Heath was copied on this memo, he claims he never received it.  **See** Exhibit 9 at 81.

On May 14, 2001, Siegfried came into work and discovered that a packet of documents containing a letter from his doctor to LVD, his social security number, and other documents relating to his medical restrictions were posted throughout the plant. **See** Exhibit 1 at 191 and packet of documents referred to above attached as Exhibit 38.

Siegfried physically picked up a couple dozen of these packets of documents from a table in the lunchroom.  **Id.** at 198.

Siegfried gave Bivighouse Exhibit 38 and told him that copies of those documents were posted throughout the plant.  **See** Exhibit 20 at 182.  Siegfried told Bivighouse that right before Jeff (garage employee) found copies of Exhibit 38, that he saw Rohrbach walking through the department.  **See** Exhibit 1 at 209-210.  Siegfried told Bivighouse that Terri McGreevey (LVD employee) told him that Rorhbach had given a copy of Exhibit 38 to Linda (LVD employee), who worked with McGreevey.  **Id.** at 211.  Siegfried subsequently checked with McGreevey and she said that Bivighouse never contacted her.  **Id.** at 213.  Siegfried also checked with Jeff and he said that he had not been contacted by Bivighouse.  **Id.** at 214.

Bivighouse purportedly investigated this incident, however he did his investigation after the fact and nobody saw or knew anything.  **See** Exhibit 17 at 150.  As part of his investigation, Bivighouse went to Heath and said he hoped that Heath had not left this information sitting on top of his desk.  **See** Exhibit 20 at 184.  Siegfried knows that Heath had a copy of Exhibit 38 because he saw the documents on Heath's desk.  **See** Exhibit 1 at 206.  Even though the first page of Exhibit 38 indicates it was copied to Heath, Heath testified that the first time he saw that first page was when he prepared for his deposition with counsel.  **See** Exhibit 9 at 82.  He saw the second page before and he claims he never saw the third through sixth pages before.  **Id.** at 82-84.

On May 23, 2001, Siegfried came into work in the morning and found a typed insult at the time clock, on the floor of his office and in the employee lunch room. Copies of the insult are attached as Exhibit 39.  The insult stated:

> Apparently, all you need, to do, is get hurt (or act like it) and you can make your own deal …. This person has been on lite duty for 13 years, at full union wage (just like a hard working person) never had to be re-checked by any other doctors.  Never had anything done to try and get netter.  Never worked a day in his life……  Just keep showing up and collecting 40,000 per year….  What about us working people?  Are we being treated fair or are we being harassed by having management stick this kind of crap in our face.  Let's keep going till this company starts to appreciate the workers and not the cry-babies. Power to the working man…………

Siegfried brought this posting to Kett.  **See** Exhibit 17 at 151.  Kett assumes that the document refers to Siegfried.  **Id.** at 152.  Kett had no involvement in investigating this incident because it involved going over into the plant and she does not usually go into the plant to investigate those types of things.  **Id.** at 153.  Siegfried showed this posting to Bivighouse and Bivighouse said that he saw it posted but left it up.  **See** Exhibit 1 at 279.

Fran Hendricks saw Exhibit 39 posted all over the plant – at the time clocks, every urinal, every bathroom stall, every wall where something could be pasted.  **See** Exhibit 27 at 25.  Hendricks knew that this was meant for Siegfried and that somebody in the maintenance department posted it.  **Id.** at 25-27.  Hendricks believes that other maintenance department employees did not want Siegfried in the department because he had a light duty job and they harassed him because he was on light duty.  **Id.** at 29-30. He heard Kibblehouse state he did not want Siegfried in the department because he was not helping them out.  **Id.** at 35.  He also heard Rohrbach state that he wanted Siegfried out of the maintenance department.  **Id.** at 36.  Hendricks told Bivighouse that he thought Rohrbach was responsible for the harassment, but he could not prove it.  **Id.** at 36-37.

16

Despite what Hendricks' knew, he was told by Heath not to get involved.  **Id.** at 44, Exhibit 9 at 124.

On June 1, 2001, Seigfried's time card was moved, his office was broken into, the extension cord to the air conditioner in his office was stolen, his files and desk was gone through, the lock on his locker was greased up and his locker was wire tied shut.  **See** Exhibit 1 at 284.  Siegfried believes he complained about this.  **Id.** at 285-86.

On June 6, 2001, Siegfried found another power to the working man posting in the employee lunch room.  **See** posting Siegfried found on that date attached as Exhibit 40.  On June 15, 2001, Siegfried arrived at work and discovered that someone had got into his office and urinated in his hard hat and chair.  **See** Exhibit 1 at 270 and Siegfried's daily log for June 15, 2001 attached as Exhibit 41.  He sat in his chair and his pants got wet before he smelled the urine.  **Id.** at 271.  He showed the hard hat to Kett.  **Id.** at 273.

On September 25, 2001, Siegfried came into work and discovered that antiseize (a greasy lubricant) was placed on his door knob.  **See** Exhibit 1 at 288.  Siegfried believes he told Bivighouse about this incident.  **Id.**  Bivighouse spoke with Heath about this incident and Heath's response was that because not too many people like Siegfried anybody could have done it.  **See** Exhibit 20 at 192.  A meeting was held with the maintenance department on that day during which the employees were told disciplinary action would be taken against anyone found to have committed harassment or anyone that was hiding information.  **Id.** at 193.  The maintenance employees were told that if the company had to fire the whole department it would.  **See** Exhibit 17 at 111.

By the time of the September 2001 meeting, Siegfried had filed a complaint with the Pennsylvania Human Relations Commission and LVD had been served with the complaint nearly two months prior to the meeting.

## IV.    LEGAL ARGUMENT

### A.    Summary Judgment Standard

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c).  In making its determination, a court should view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. Reeves v. Sanderson Plumbing, 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2510-11 (1986). These requirements are to be applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues.  Stewart v. Rutgers University, 120 F.3d 426, 431 (3d Cir. 1997).  The court may not weigh the evidence or make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.1998).

"This Court has noted that proving discriminatory intent "is both sensitive and difficult" and has recognized that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes."  U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716 (1983). Accord, Hunt v. Cromartie, 526 U.S. 541, 119 S.Ct. 1545 (1999). "Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence….  [D]irect evidence of an employer's motivation will often be unavailable or difficult to acquire.  Sheridan v. E.I. du Pont de Nemours and Co., 100 F.3d 1061, 1071 (3d Cir. 1996), cert. denied, 521 U.S. 1129 (1997).

"[T]he determination of whether there is 'hostility' or 'abuse' in the workplace …
is the sort of issue that is often not susceptible of summary resolution."  DiLaurenzio v.
Atlantic Paratrans, Inc., 926 F.Supp. 310, 314 (E.D.N.Y. 1996).

**B.    Siegfried Has Presented Sufficient Evidence that He is Disabled
to Create a Jury Question**

Under the Americans with Disabilities Act (ADA), an individual has a
"disability" if he: 1) has a physical or mental impairment that substantially limits one or
more of the major life activities of the individual; 2) has a record of such an impairment;
or 3) is regarded as having such an impairment.  42 U.S.C. §12102(2); 29 C.F.R.
§1630.2(g).  As a preliminary matter, the definition of "disability" is substantially similar
under the ADA and Pennsylvania Human Relations Act (PHRA).  Courts generally
interpret the PHRA in accord with its federal counterparts.  Kelly v. Drexel University,
94 F.3d 102 (3rd Cir. 1996).

An "impairment" includes any physiological disorder, or condition, or anatomical
loss affecting one or more of the following body systems: neurological or
musculoskeletal.  29 C.F.R. §1630.2(h)(1).  An impairment rises to the level of a
disability if it substantially limits one or more major life activities.  29 C.F.R. §1630.2(j).
The term "substantially limits" means that a person is: 1) unable to perform a major life
activity that the average person in the general population can perform; or 2) significantly
restricted as to the condition manner or duration under which he can perform a particular
major life activity as compared to the average person in the general population.  29
C.F.R. §1630.2(j); Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196
(2002).

Several factors are considered when determining whether someone is substantially limited in a major life activity. These factors include: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact of or resulting from the impairment. 29 C.F.R. §1630.2(j)(2). The term "major life activities" is defined as functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, bending, breathing, learning and working. 29 C.F.R. §1630.2(i). In order for a person to be substantially limited in the major life activity of working, the person must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. 29 C.F.R. §1630.2(j)(3).

In enacting the ADA, Congress noted that disabled persons constitute a "distinct and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society." 42 U.S.C. §12101(a)(7). Congress also realized that misperceptions and ignorant stereotypes regarding the disabled were so commonplace that societal discrimination adversely affected many people who were not disabled. S.Rep. No. 101-116 at 9. Accordingly, Congress decided to extend statutory protection not only to disabled persons, but also to individuals with records of prior disabilities who are no longer significantly inhibited and persons who are regarded by others as being disabled even when they are not. 42 U.S.C. §12102(2).

In the <u>Williams</u> case, the U.S. Supreme Court found that Williams was not disabled in performing manual tasks because she could still brush her teeth, wash her

20

face, bathe, tend her flower garden, fix breakfast, do laundry and pick up around the house.  534 U.S. at 202.  On the contrary, Siegfried cannot bathe, he cannot wash or dry his back, he cannot work around the house, he gave up gardening after his back injury and he has been unable to play sports with his son.  Unlike Williams, Siegfried is substantially limited in performing manual tasks.

Similarly, Siegfried is substantially limited in the major life activity of bending.  Siegfried testified that **anytime** he bends forward, he has a problem.  <u>See</u> Exhibit 1 at 340.  He has difficulty spitting while brushing his teeth and putting on his pants and socks and he does not wear shoe-laced shoes because it is too hard for him to tie them.  <u>**Id.**</u> at 340-41.

Siegfried is also substantially limited in the major life activity of working.  LVD created the position of maintenance clerk because Siegfried was unable to perform any other jobs at the plant.  In 2001, Siegfried's job was further modified to take away the one slightly physical part of his job – relief at the treatment plant.

Dr. Ruth has been Siegfried's treating physician from Siegfried's initial back injury in 1987 through the present.  In his expert report, Dr. Ruth establishes that there is a genuine issue of material fact regarding whether Siegfried is disabled.   Dr. Ruth states that Siegfried cannot do any lifting, no bending, no walking of any distance and no standing for more than a few minutes.  <u>See</u> Exhibit 14.  Dr. Ruth further states that Siegfried must be careful because any way that he twists or turns can cause him sharp pain.  <u>**Id.**</u>  "All aspects of his left have been affected by the pain because he must always be mindful of what he does and how he does it, so as not to precipitate an episode of sharp pain, which can last up to hours or days."  <u>**Id.**</u>

Even if Siegfried is not disabled under the first prong definition of disability, Siegfried has a record of being disabled with LVD. This prong applies where persons previously suffered from a substantially limiting disability and have a record of such, but who are no longer substantially limited. The documents describing Siegfried's back injury and his substantial limitations from the late 1980's through the mid 1990's constitute such a record of impairment. On June 28, 1988 LVD's former Director of Operations Bill Peifer wrote that he could not identify any existing job classifications or any light duty "productive" jobs compatible with Siegfried's medical restrictions. **See** Exhibit 4. By the company's own admission, Siegfried was previously disabled.

Finally, even if Siegfried is not disabled under the first two prongs of the definition of disability, then he is regarded as disabled. Under the ADA, a person is regarded as disabled if the person: 1) has a physical or mental impairment that does not substantially limit major life activities but is treated by his employer as constituting such limitation; 2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or 3) has no such impairment, but is treated by his employer as having a substantially limiting impairment. 29 C.F.R. 1630.2(1); Taylor v. Phoenixville School District, 113 F.Supp 2d 770 (E.D.Pa. 2000).

Siegfried's maintenance department co-workers regarded him as disabled and that is why they wanted him out of their department. Hendricks told Siegfried that he heard Kibblehouse state that he was tired of carrying Siegfried for the last 10 years and they wanted him out of the department. **See** Exhibit 1 at 80-81. Siegfried's boss Heath regarded him as disabled in that Heath stated that he always had to put somebody down

in the treatment plant to help Siegfried and Siegfried was not physically capable of doing

the job himself because of his back.  **See** Exhibit 9 at 58, 87.  LVD removed Siegfried's

treatment plant responsibilities in 2001 as a result of a determination that his light duty

status precluded him from performing bargaining unit work.  **See** Jim Macri's May 21,

2001 letter to Siegfried attached as Exhibit 42.

>    **C.    Siegfried Has Presented Sufficient Evidence that He has been**
>    **Harassed because of his Disability to Create a Jury Question**

The elements of a hostile environment disability harassment claim are that: 1)

Siegfried was disabled; 2) he was subject to unwelcome harassment; 3) the harassment

was based on his disability, 4) the harassment was sufficiently severe or pervasive to alter

the conditions of employment and create an abusive working environment; and 5) LVD

knew or should have known of the harassment and failed to take prompt effective

remedial action.  Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d

661, 667 (3rd Cir. 1999).

LVD correctly states that Siegfried testified that he believes he was harassed

because he is on light duty.  Whether Siegfried actually used the terminology that he

believed he was harassed because of his disability as opposed to his light duty status is

irrelevant.  Siegfried's and Hendricks' testimony that Siegfried was harassed based on his

light duty status create a genuine issue of material fact for a jury to decide whether the

harassment Siegfried was subjected to was because of his disability.  It is clear that

certain maintenance department employees thought Siegfried was physically incapable of

doing their work so they sought to eliminate him from their department by repeatedly

harassing him.  "…[C]ourts have consistently recognized general incidents of co-worker

abuse that are not otherwise facially discriminatory as potential evidence of unlawful

discrimination or harassment."  Michael M. Mustokoff and Brian P. Crowner, <u>The</u>
<u>Dangers of Physician Misconduct in the Workplace</u>, July 21, 2003 issue of The Legal
Intelligencer attached as Exhibit 43.  For instance, harassing conduct, while not explicitly
sexual in nature, should be considered along with overtly sexually abusive conduct in
assessing a hostile environment claim.  <u>O'Rourke v. City of Providence</u>, 235 F.3d 713,
729 (1st Cir. 2001).

In the <u>Galle</u> case cited by LVD in its brief, this Court granted defendant's
summary judgment motion because Galle had not presented evidence of a sufficiently
specific nature to establish a genuine issue of material fact.  <u>Galle v. Pennsylvania Dep't</u>
<u>of General Servs.</u>, 2003 Westlaw 21293795 (E.D.Pa. March 18, 2003).  Siegfried has
presented numerous specific incidents of harassment that establish a genuine issue of
material fact as to whether he endured a hostile work environment.

**D.      Siegfried Has Presented Sufficient Evidence that the Harassment He**
**was Subjected to was Severe and Pervasive to Create a Jury Question**

Hostile environment harassment exists where the workplace conduct creates an
intimidating or hostile working environment without resulting in any tangible loss of job
position or benefits.  <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57 (1986).  This occurs
when an employer subjects an employee to disparaging remarks or behavior so offensive
as to "alter the conditions of the employee's employment and create an abusive work
environment."  <u>Harris v. Forklift Syst., Inc.</u>, 510 U.S. 17, 21 (1993).  The prohibition on
workplace harassment based on a protected class forbids only behavior so objectively
offensive to alter the conditions of the victim's employment.  <u>Oncale v. Sundowner</u>
<u>Offshore Servs, Inc.</u>, 118 S.Ct. 998 (1998).

The Third Circuit has defined "pervasive harassment" as "that which occurs regularly or when incidents are in concert with one another." <u>Andrews. City of Philadelphia</u>, 895 F. 2d 1469, 1484 (3rd Cir. 1990).  Courts should determine whether an environment is hostile or abusive "only by looking at all the circumstances. " <u>Harris</u>, 510 U.S. at 23.  The Third Circuit has further explained that courts must look at the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. **<u>See</u>** <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 426 (3rd Cir. 2001) (**citing** <u>Harris</u>, 510 U.S. at 23.  "Courts should not consider each incident of harassment in isolation." <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 155 (3rd Cit. 1999) (**citing** <u>Andrews</u>, 895 F.2d at 1484).  "Rather, a court must evaluate the sum total of abuse over time." **<u>Id.</u>** at 155

The evidence before the Court shows that Siegfried was subjected to repeated acts of subjective and objective humiliation, embarrassment and degradation.  To cite just a few instances, his work area and equipment were urinated in twice, his medical restrictions and social security number were plastered throughout his workplace for anyone to see, he was publicly humiliated by the power to the working man posting and he was told that his co-workers want him out of the department he had worked in for over 10 years.  These are simply several examples of the repeated severe and pervasive harassment that Siegfried endured between January 2001 – September 2001.  Hendricks testified that Siegfried shared with him that it has been a pain to come to work, the harassment bothers the living hell out of him and he feels like he cannot trust any of his

co-workers.  **See** Exhibit 27 at 48-49.  According to Siegfried's boss, Siegfried is not well-liked at the plant.  **See** Exhibit 9 at 56.

> E.     **Siegfried Has Presented Sufficient Evidence that LVD Failed to Exercise Reasonable Care to Prevent and Correct Promptly the Harassing Behavior to Create a Jury Question**

Because Siegfried has not suffered a tangible job loss as a result of the hostile work environment harassment, LVD is entitled to invoke the Faragher/Ellerth affirmative defense.  The affirmative defense is comprised of two elements: 1) the employer exercised reasonable care to prevent and correct promptly any impermissibly harassing behavior; and 2) the employee unreasonably failed to take advantage of any corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2293 (1998); Burlington Indus., Inc. v. Ellerth, 118 S.Ct. 2257, 2270 (1998).

In Bennett v. Progressive Corp., 225 F.Supp. 2d 190 (N.D.N.Y. 2002), the court denied the employer's summary judgment motion in part because the employer used untrained personnel to investigate plaintiff's internal complaint of sexual harassment. Similarly, in this case, although Kett is LVD's Human Resources Manager and presumably has experience investigating claims of harassment, she repeatedly handed off the investigations into Siegfried's harassment complaints to Bivighouse.  **See** Exhibit 17 at 79.  Bivighouse has no human resources training and Kett does not even know what his job description is.  **See** Exhibit 20 at 46-47 and Exhibit 17 at 79.  Additionally, Bivighouse was asked to investigate a department which he had worked in as an employee and subsequently a manager for 34 years.

26

Kett had certain harassment questionnaires and guidelines to use in harassment investigations, yet she never filled out or used those forms.  **See** Exhibit 17 at 101-104. Kett initially testified that she thought she received those forms (Exhibits 22-26) after Siegfried's first harassment complaint, but then she stated that she received the harassment forms after Siegfried filed his PHRC complaint.  **See** Exhibit 17 at 99-100. Several weeks after Kett's deposition, she submitted a declaration stating that while she had never completed any of the questionnaires she was shown during her deposition, she had used them in investigating complaints of harassment.  **See** Declaration of Diane Kett attached as Exhibit 44.

Kett testified that she never failed to document in writing any meeting she had with anyone regarding the issue of harassment.  The only documents LVD has produced to substantiate its claim that it took adequate remedial measures to investigate Siegfried's complaints of harassment are the notes of Kett and Bivighouse from a February 2, 2001 meeting with Siegfried (Exhibits 29 and 30) and no further documentation until the September 25, 2001 meeting with the maintenance department employees where they were told that the whole department could be fired.  That is a 7 ½ month gap with absolutely no documentation whatsoever on LVD's part that it was doing anything about Siegfried's repeated harassment complaints.  Moreover, the September 25, 2001 meeting was held nearly two months after LVD had been served with Siegfried's PHRC Complaint.

After Siegfried's first several complaints of harassment and in approximately early February 2001, Heath had a series of meetings with each shift of the maintenance department in which he told the employees that if they were found to have committed any

act of harassment they would be immediately terminated.  Heath made it clear that it did

not matter whether the employee had been with the company for 40 or 4 years – they

would be terminated and the company had the union's support.  Several months later,

Rohrbach, a maintenance department co-worker of Siegfried's, was found to have forged

Heath's initials on a work order directed to Siegfried.  Instead of doing what Heath said

the company would do, LVD simply issued Rohrbach a written warning.  This is true

even though Rohrbach initially denied committing the forgery and did not fess up until

after Bivighouse threatened to use a handwriting expert.

Siegfried testified that Bivighouse asked him to investigate his own harassment

complaints on more than one occasion.  Siegfried further testified that Bivighouse did not

follow-up on leads Siegfried provided him to help him determine the identity of the

harassers.

LVD's harassment policy contains a provision that directs managers or

supervisors who receive a report of a known or suspected code of conduct violation to

immediately pass that report along to the ethics compliance officer.  **See** Exhibit 18 at 21-

22.  There has been no evidence or testimony presented by LVD that Kett, Bivighouse or

Heath ever complied with that portion of the policy.  Even if LVD claims that the

"corporate office" or ethics compliance officer was contacted, that was not done until

after LVD had been served with Siegfried's PHRC complaint.

There is a genuine issue of material fact whether LVD's actions during the time

period of January 2001 – September 2001 were prompt and effective and whether its own

policies were effective in addressing Siegfried's complaints of harassment.

V.     **CONCLUSION**

For the foregoing reasons, Plaintiff, Luther B. Siegfried, Jr., respectfully requests

that this Court deny Defendant's Motion for Summary Judgment on all of Plaintiff's

Claims.

Respectfully submitted,

By: _____

Scott M. Pollins, Esquire
Pa. Attorney Id. No. 76334
1620 Schoolhouse Lane
Lower Gwynedd, PA 19002-1902
(215) 699-5388

Attorney for Plaintiff, Luther B. Siegfried, Jr.

Date: _____